**WEEKS, Secretary of War, et al. v. GOLTRA.**

(Circuit Court of Appeals, Eighth Circuit. July 23, 1925.)

No. 6871.

1. Estoppel ⊂⇒22(1)—Lessee of towboats and barges from United States estopped to deny government's title.

Where lessee of fleet of towboats, barges, and other appliances, constructed by the federal government as war measure for use on upper Mississippi river, knew and recognized that fleet was created by government and absolutely belonged to it, and by terms of lease he acknowledged title to be in the government, he was estopped from contending to the contrary.

2. United States ⊂⇒125—Suit against Secretary of War and others to require return of property to plaintiff held to be in fact against government itself, and plea of immunity should have been sustained.

Where lease by United States of towboats and barges reserved to government right, obligation, duty, and power to cancel and abrogate

it if, in judgment of government's representative vested with power to make lease, lessee did not comply with lease, and judgment of Secretary of War and others was judgment to which lease related, suit by lessee against Secretary and others to require return of property to plaintiff was suit in fact against government itself, and its plea of immunity should have been sustained.

**3. United States ⬉57—Property of government, constructed for war use, held to come under control of Secretary of War.**

Property of the government, constructed for preparations for war, out of funds appropriated by Congress, *held* to come under control of Secretary of War.

Sanborn, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Suit by Edward F. Goltra against John W. Weeks, Secretary of War, and others. From an order granting a temporary mandatory injunctive order against defendants, they appeal. Reversed, with directions.

Lon O. Hocker, Sp. Asst. Atty. Gen., for appellants.

Joseph T. Davis and Douglas W. Robert, both of St. Louis, Mo. (Charles Claflin Allen, of St. Louis, Mo., on the brief), for appellee.

Before SANBORN, Circuit Judge, and POLLOCK and SYMES, District Judges.

POLLOCK, District Judge. For convenience, the parties will be designated as they stood on the record below.

This appeal brings before this court for review an order granting appellee, plaintiff below, a temporary mandatory injunctive order against appellants, defendants below, enjoining and commanding them to restore to said plaintiff at the port of St. Louis certain towboats, barges, and other appliances theretofore by him held in possession, under and by virtue of a certain written agreement of lease entered into between plaintiff and the United States through its agent and representative designated by the honorable Secretary of War on the 28th day of May, 1919, until defendant below, the honorable Secretary of War, acting under and in pursuance of the terms of said lease, on March 3, 1923, determined the conditions of said lease had been broken by plaintiff, and declared the same terminated, and directed the restoration of the government's property to its representatives at the port of St. Louis, Mo. Said order of the honorable Secretary of War terminating the lease not having been complied with, by direction of the Secretary

of War the fleet of barges and towboats and handling facilities at St. Louis were seized by order of the War Department by Col. T. Q. Ashburn, Chief of the Inland and Coastwise Waterways Service, when the order sought to be reviewed was entered.

But two questions are presented by this appeal. The solution of these questions determines the controversy. They are as follows (1) Is this suit one in legal effect and intendment against the government of the United States? (2) Is the question presented as to the right of the government to retake the leased property one committed to the decision, judgment, and discretion of an official of the government, or is it a justiciable controversy for submission to and decision by a court of justice?

The controversy arises in this manner:

Growing out of the emergency created by the late war, the necessity arose, or was thought to arise, of having towboats and barges on the upper Mississippi river employed in carrying coal and iron ore, and other heavy minerals to St. Louis, to be there used in the manufacture of iron needed in the production of munitions of war. To subserve this purpose, the United States Shipping Board Emergency Fleet Corporation allotted to the Chief of Engineers of the United States armies the sum of $3,860,-000 with which to have constructed at Point Pleasant, W. Va., Pittsburgh, Pa., and Keokuk, Iowa, under contract of August 1, 1918, nineteen barges, and under plans and specifications prepared for such purpose by the government either three or four towboats. These barges having been constructed, or nearing completion, and the towboats having been contracted for when the Armistice was signed and the emergency of war ended. The government then desiring to make some disposition and use of the fleet, and, there having been prior negotiations with plaintiff, the written contract of lease, the terms of which are in controversy herein, was entered into on the 28th day of May, 1919, as follows:

"1. This lease, made this 28th day of May, 1919, between the United States of America, represented by Major General William M. Black, Chief of Engineers, United States Army, directed by the Secretary of War so to represent the United States, hereinafter designated as the lessor, party of the first part, and Edward F. Goltra, of the city of St. Louis, state of Missouri, hereinafter designated as the lessee, his heirs, executors, and administrators, party of the second part, witnesseth that

"Whereas, the party of the second part at the request of certain government officials as an emergency of war, in order to increase the output of pig iron, made certain arrangements for iron ore and coal properties with a view to producing pig iron at St. Louis, Mo.; and

"Whereas, the United States Shipping Board Emergency Fleet Corporation, allotted to the Chief of Engineers the sum of $3,860,000 for the construction of a fleet of towboats and barges for the primary purpose of transporting the said iron and coal to and from St. Louis, Mo.; and

"Whereas, on the 1st day of August, 1918, the United States of America entered into contracts for the construction of nineteen barges suitable to use for the transportation of said iron ore and coal; and

"Whereas, the United States of America is about to construct by contract or otherwise a fleet of towboats for the purpose of towing the said barges, the construction of which in the opinion of the Secretary of War is necessary to enable the government to dispose of the said barges more advantageously; and

"Whereas, the said fleet of towboats and barges is especially designed for and adapted to the transportation of iron ore and coal; and

"Whereas the said lessee has entered into various engagements and undertakings to increase the pig iron supply as a war measure, which may have created, and according to the contention of the lessee did create, obligations on the part of the United States to the said lessee, but which he entirely releases and discharges in part consideration of this lease, which engagements, undertakings, and lease are in furtherance of the original design for the assembling of coal and iron ore at St. Louis, Mo., and for the increase of pig iron facilities:

"Now, therefore, the said lessor doth hereby charter and lease unto the said lessee for a term of five (5) years, beginning with the date of delivery to the lessee of the first barge or towboat and terminating five (5) years after the delivery of the first barge or towboat the following described property, viz.: Nineteen barges which are being constructed under contracts dated August 1, 1918, with the Marietta Manufacturing Company, of Point Pleasant, W. Va., the Dravo Contracting Company, of Pittsburgh, Pa., and the Dubuque Boat & Boiler Works, of Dubuque, Iowa, and three or four towboats about to be constructed and described in accordance with specifications prepared or to be prepared therefor.

"It is thereupon covenanted and agreed between the said parties as follows:

"2. (a) That the said lessee shall operate as a common carrier the said fleet of three or four towboats and nineteen barges upon the Mississippi river and its tributaries for the period of the lease and of any renewals thereof, transporting iron ore, coal, and other commodities at rates not in excess of the prevailing rail tariffs, and not less than the prevailing rail tariffs without the consent of the Secretary of War; but nothing herein shall be deemed to prevent the most profitable and most advantageous use of said vessels being made, provided the Secretary of War consents to such use other than as a common carrier.

"(b) That the lessee shall pay all operating expenses of the fleet and maintain, during the continuance of the lease, each towboat and barge of the fleet in good operating condition to the satisfaction of the lessor, and shall hold the United States entirely free from all liabilities and indebtedness of every kind in connection with the operation, care, and maintenance of the entire fleet and all its engines, boilers, outfit, tackle, apparel, furniture, and appurtenances; and the lessee shall, without unnecessary delay, as soon as he acquires any knowledge thereof, discharge any and all maritime liens that may at any time during the continuance of this lease from any cause arise against or become impressed upon any one, any or all of the fleet of nineteen barges and three or four towboats. The lessee shall procure and take out, for the benefit of the United States, insurance, both fire and marine, in such an amount as in the judgment of the Secretary of War each of the vessels may require and with such underwriters or in such companies as are approved by the lessor, insuring each and every one of the barges and towboats against physical injury to them, or any of them, and against the loss of any or all of the barges and towboats hereby leased. The lessee shall likewise procure and take out fire, marine, and towers liability insurance in such an amount as in the judgment of the Secretary of War each of the vessels may require, with such underwriters or in such companies as shall be approved by the lessor, and for the benefit of the United States, insuring each of the vessels against such injury as may be inflicted by such vessel upon other property, such as might result in maritime liens, or in liability or ob-

ligation by the lessor, and, if the lessor shall require, execute, and deliver to the lessor, a bond in the penal sum of three hundred thousand ($300,000) dollars, conditioned to protect the United States against such liability or obligation and against any and all maritime or other liens against the fleet or any of the vessels of the fleet and against any and all depreciation in value of all or any of said vessels, by reason of maritime or other liens arising or becoming impressed upon them or any of them. Such bonds as in any part of this contract are required to be given by the lessee for the benefit of the United States shall always and at all times during the continuance of this lease be kept good, and shall be replaced at any time by other good and sufficient bonds at the request of the lessor, and they shall be kept good, not only against the impaired credit or financial responsibility of the obligor or surety, but also against partial depletion or entire exhaustion thereof, brought about by the payment of losses or indemnities thereunder.

"(b-1) All salvage earned, to which any of the said fleet shall become entitled, shall be for the benefit of the United States, after deducting all expenses incident thereto and the proportion due to the master, officers, and crew.

"(c) For the protection of persons furnishing materials, services, and labor in connection with the operation, furnishing, repair, care, and maintenance of the said towboats and barges, the lessee shall furnish to the lessor, and continue in effect during the period of the lease, and in case of sale until title passes to the purchaser, a good and sufficient bond, approved by the lessor, in the penal sum of two hundred thousand ($200,000) dollars.

"3. The net earnings above operating expenses and maintenance for each and every ton of cargo moved and all other net earnings shall be turned over by the lessee to the Secretary of War as soon as practicable after each proper determination of the amount thereof, but at least every ninety days, for deposit with the Treasurer of the United States to the credit of the Secretary of War in a special deposit account, and shall continue so to be turned over to him and so deposited by him until such time as said net earnings shall equal the full amount of the cost of the several vessels of the fleet, plus interest on said cost at 4 per cent. per annum computed from the respective dates of delivery of the several vessels of the fleet, and that thereafter all net earnings over and above the full amount of the said cost of the several vessels of the fleet, plus interest on said cost at 4 per cent. per annum, shall be deposited to the credit of the Secretary of War at least every ninety days by the lessee in one or more national banks in St. Louis, Mo., to be designated by the lessor, to be held for the fulfillment of the terms of this lease, provided that earnings derived from the transportation of commodities in barges hereby leased, moved by towboats not furnished by the United States, shall, until all vessels of the government fleet are delivered to the lessee, be subject to deduction of cost of the hire of the necessary towboats to move said barges, in addition to any other operating expenses and maintenance in connection therewith.

"The lessee shall keep accurate detailed accounts of all tonnage moved and of all moneys received and due, and of all items of operating costs, and his accounts shall at all times be subject to inspection by the lessor or his representatives. The overhead expenses included in operating costs shall be subject to the approval of the lessor, and any items not approved by him, and to which the lessee may object or take exception, shall be referred to the Secretary of War, whose decision shall be final.

"4. The approved national banks shall be required to furnish good and sufficient bonds, approved by the lessor, in penal sum in amounts at least equal to the sum deposited conditioned for the safety of the funds held on deposit, as provided in this lease, said bonds to be delivered to the custody of the lessor and to be maintained during the period of the deposit. The said banks shall credit to the account interest at the local prevailing rates of nonchecking accounts.

"5. Within three months prior to the expiration of the lease, or of any period of renewal, or sooner, if so desired by the lessee, a board of three persons shall be appointed, one to be designated by the lessor, one by the lessee, and one by the said two members, unless they shall fail to agree, in which case the third member shall be appointed by the Secretary of War, all of whom shall be familiar with the construction and cost of river vessels of steel and with the current market values thereof, to appraise the value of the said fleet at that time, and the said lessee shall be given the option of purchasing the fleet upon the following terms:

"(a) If the funds turned over to the Secretary of War and deposited by him with

the Treasurer of the United States, under section 3 of this lease, shall aggregate a sum equal to the full amount of the cost of the several vessels of the fleet, plus interest on said cost at 4 per cent. per annum as aforesaid, then in case of the exercise of said option by the lessee said funds shall be applied to payment in full for the fleet, and any net earnings over and above the amount required for such payment on deposit in said bank or banks, provided in section 3 of the lease, or otherwise held on deposit, shall be paid to the lessee.

"(b) If the funds turned over to the Secretary of War and by him deposited with the Treasurer of the United States, under section 3 of this lease, shall be less than the full amount of the cost, plus accrued interest at the rate of 4 per cent. per annum on such cost, but greater than the appraised value, the funds shall in said event be applied to payment of the fleet at the appraised value, and any amount in excess of the appraised value shall be retained by the Secretary of War for the use and benefit of the United States; and the fleet shall thereupon become the property of the lessee.

"(c) If the funds turned over to the Secretary of War and by him deposited with the Treasurer of the United States, as provided by section 3 of this lease, shall be less than the appraised value, then in the event aforesaid such funds shall be applied to the payment of the fleet so far as they shall reach, and the lessee shall pay in addition thereto, in the manner specified in section 6 hereof, the amount whereby the aggregate funds so turned over to the Secretary of War fall short of the said appraised value.

"6. It is further covenanted and agreed that the method of payment of any amount which the purchaser shall be required to pay, and not provided for out of the sums deposited to the credit of the Secretary of War, shall be as follows: There shall be sixteen (16) payments. The first shall consist of all moneys on deposit to the credit of the Secretary of War, as indicated above, and shall be so applied at the date of the sale. The lessee shall execute for the balance fifteen (15) promissory notes, in equal amount, payable at the expiration of one year, two years, three years, etc., from date of sale with interest at 4 per cent. per annum. Title to the property shall remain in the United States until the payment of the whole of the purchase price of said property.

"7. It is understood and agreed that the lessee assumes full responsibility for the safety of his employees, plant, and materials, and the said nineteen barges and three or four towboats, and for any damage or injury done by or to them and from any source or cause in the operation of the fleet.

"8. The lessor reserves the right to inspect the plant, fleet, and work at any time to see that all the said terms and conditions of this lease are fulfilled, and that the crews and other employees are promptly paid, monthly or oftener; and noncompliance, in his judgment, with any of the terms or conditions, will justify his terminating the lease and returning the plant and said barges and towboats to the lessor, and all moneys in the Treasury or in bank to the credit of the Secretary of War shall be deemed rentals earned by and due to the lessor for the use of said vessels.

"9. In the performance of the conditions of this lease, the employment of persons undergoing sentences of imprisonment at hard labor which have been imposed by courts of several states, territories, or municipalities having criminal jurisdiction is prohibited.

"10. No member or delegate to Congress, or resident commissioner, nor any person belonging to or employed in the military service of the United States, is or shall be admitted to any share or part of this contract, or to any benefit which may arise herefrom; but under the provisions of section 116 of the Act of Congress approved March 4, 1909 (35 Stats. 1109) this stipulation, so far as it relates to members of or delegates to Congress or resident commissioners, shall not extend or be construed to extend to any contract made with an incorporated company for its general benefit.

"In witness whereof the parties aforesaid have hereunto placed their signatures of the date first hereinbefore written.

"Witnesses:

"John Stewart, Lt. Col. of Engineers, as to William M. Black [Seal] Major General, Chief of Engineers, U. S. Army (First Party).

"————, Lt. Col. Engrs., as to Edward F. Goltra [Seal] Second Party)."

The entire contract is set forth above for the purpose of assisting in the determination of the two problems presented as above stated.

There was a supplementary contract entered into between the parties, providing for loading and unloading facilities at the port of St. Louis, May 27, 1921. However, as this supplemental contract is in entire recognition of the former contract of lease,

it does not in any respect modify its terms, and the same is not set forth.

The fleet of towboats and barges were completed and turned over to plaintiff as lessee under the contract about July 15, 1921. He continued to hold the same in possession until March 3, 1923, on which date the honorable Secretary of War determined the terms and provisions of the lease had not been complied with by plaintiff, and issued the order of that date, which reads, as follows:

"War Department,
Washington, March 3, 1923.

"E. F. Goltra, Esq., La Salle Building, St. Louis, Missouri—Sir: Pursuant to the right reserved in paragraph eight of the contract dated May 28, 1919, and the supplement thereto dated May 26, 1921, between you and the United States, for the operation as a common carrier of a fleet of four towboats and nineteen barges, and the erection of unloading facilities, you are hereby notified that in my judgment you have not complied with the terms and conditions of said contract, in that you have failed to operate the said towboats and barges as a common carrier and in other particulars.

"I therefore declare the said contract and the supplement thereto terminated. You are hereby directed, upon the receipt of this notice, immediately to deliver possession of the said towboats and barges, and any unloading facilities erected pursuant to the supplemental contract and paid for by funds of the United States, to Col. T. Q. Ashburn, Chief Inland and Coastwise Waterways Service, who will deliver this notice, and who is instructed and authorized to receive and receipt for the property herein mentioned.

"Yours very truly,
"John W. Weeks, Secretary of War."

Plaintiff refusing to comply with this order, on March 22d thereafter Acting Secretary of War, Mr. Davis, issued to Col. T. Q. Ashburn, Chief of Inland and Coastwise Waterway Service, the following order:

"War Department,
"Washington, March, 22, 1923.

"Colonel T. Q. Ashburn, Chief, Inland and Coastwise Waterways Service—Colonel:

"1. You are hereby designated as the representative of the United States for the purpose of taking possession of the towboats and barges leased by the United States to Edward F. Goltra under a contract dated May 28, 1919.

"2. You will proceed to St. Louis, Missouri, Fayville, Illinois, and, if necessary, to Paducah, Kentucky, or elsewhere the said property may be found, and at once take possession of all of the said towboats and barges, or any number thereof that may be found.

"3. In taking such possession you are directed not to employ or use any action that will occasion strife, bodily force, or endanger the public peace.

"4. If physical resistance be offered to your taking such possession, you are further directed to report that fact with all attending circumstances to me at once.

"[Signed] Dwight F. Davis,
"Acting Secretary of War."

In pursuance of this order, Col. Ashburn proceeded to St. Louis, took possession of said fleet of towboats, barges, and also the loading and unloading facilities built at the port of St. Louis.

Thereupon, plaintiff filed his bill of complaint. A temporary restraining order, mandatory in form, was issued, followed by the making and entry of the temporary mandatory injunction appealed from and sought to be reviewed in this case. This reads, as follows:

"This cause coming on to be heard for a temporary restraining and mandatory injunction at the March term, 1924, of the said court, upon plaintiff's bill of complaint, the returns of the defendants heretofore filed herein and upon the evidence adduced by plaintiff and by the defendants, and the court having considered the same, doth find that plaintiff herein, Edward F. Goltra, is entitled to the relief therein prayed for, and it is therefore ordered that a temporary injunction be and is hereby granted plaintiff against the said defendants, Hon. John W. Weeks, Secretary of War of the United States, Col. T. Q. Ashburn, Chief, Inland and Coastwise Waterways Service of the United States, and James E. Carroll, United States district attorney, their agents, and servants, and any one acting by or through or for them, restraining them or either of them from in any way interfering with the possession of the plaintiff of said boats and barges and other facilities and appliances of transportation in said bill of complaint described and from taking any of same from his possession, until the further order of this court.

"And it is further ordered that said defendants, their agents and servants, and all those acting by or through or for them, be and hereby are commanded and ordered forthwith to restore to the plaintiff herein at the port of St. Louis, Mo., all of said towboats, barges, and other facilities and appliances heretofore seized by said defendants, subject to an accounting to be had for any damage resulting from the use and possession of the said boats, barges, tools and appliances since the taking.

"It is further ordered that plaintiff forthwith give a penal bond in the sum of twenty-five thousand dollars ($25,000) and that said temporary restraining and mandatory injunction remain in full force and effect until final hearing of this cause and until further order of this court.

"[Signed]. C. B. Faris, Judge."

Does this record show this to be a suit in which the government is in legal effect the real party defendant in interest? If so, as it is not in fact or name defendant, it is self-evident the suit cannot proceed in the absence of a real party in interest to the record.

This is the first question raised on this record. It is the contention of plaintiff his suit is against the officers of the government in name only, attempting without right or warrant of law to despoil him of his property rights under the lease, by acts done under mere color or cloak of their office, and for this reason the suit is not one, in any just sense, against the government itself, but is one against officials of the government in name only, attempting to commit private trespass under color of their official positions; therefore they are in the courts of our country amenable to him, not as officials of the government, but as mere individuals engaged in trespassing upon his private rights of property, and the case of the United States v. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171, and kindred cases, are relied upon, and were apparently followed by the court below.

On the contrary, it is the contention of defendants the government seized and the government alone is the real party in interest in this litigation; that the property transferred to plaintiff under the terms of the written contract in suit was the sole property of the government, contracted to be constructed for the government by the government and paid for by the government out of its own funds; that the contract in dispute, as appears on its face, is a contract made by the government

under direction of the Secretary of War with plaintiff, in the true sense and in its legal meaning of terms therein employed; that, plaintiff having contracted with the government in express terms for the lease, use, and possession of the fleet property and loading facilities, he is and of right ought to be estopped to deny the title of the government, and that it is the real party in interest; and from contending defendants, as officers of the United States in name only, and under color of their office, are in fact acting without and beyond the scope of their authority, and were threatening to do and doing him a private wrong and injury.

[1] From a reading and examination of this record, there can be no doubt whatever but that the fleet and facilities the subject-matter of the controversy was created by the government at its sole and only proper expense, and absolutely belongs to the government, and did so belong at all times covered by this suit. That plaintiff knew and recognized this fact in the making of the contract of lease on which he relies for recovery in this suit, and as by the terms of this contract of lease he acknowledges title to the property by him received in the government, he should now be estopped from contending to the contrary. The very language of the contract is plain, direct, and unequivocal on this head, and is incapable of misunderstanding in this regard. It reads, in describing the parties to it, as follows:

"This lease, made this 28th day of May, 1919, between the United States of America, represented by Major General William M. Black, Chief of Engineers, United States Army, directed by the Secretary of War so to represent the United States, hereinafter designated as the lessor, party of the first part, and Edward F. Goltra, of the city of St. Louis, state of Missouri, hereinafter designated as the lessee."

Again:

"Whereas, the United States Shipping Board Emergency Fleet Corporation, allotted to the Chief of Engineers the sum of $3,860,000 for the construction of a fleet of towboats and barges for the primary purpose of transporting the said iron and coal to and from St. Louis, Mo.; and

"Whereas, on the 1st day of August, 1918, the United States of America entered into contracts for the construction of nineteen barges suitable to use for the transportation of said iron ore and coal; and

"Whereas, the United States of America is about to construct by contract or other-

wise a fleet of towboats for the purpose of towing the said barges, the construction of which in the opinion of the Secretary of War is necessary to enable the government to dispose of the said barges more advantageously," etc.

This contract also contains a further provision that all salvage earned by the fleet in operation, after deducting expenses incident thereto and seamen's proportion, shall go to the government. In other words, it is not possible for the minds of reasonable men to disagree the subject-matter of the litigation is the sole and single property of the government. That the officials of the government named in the suit have no private interest or liability whatever in the matter, but in what they did acted, as officials of the government for the government as their principal, under the law, cannot be doubted. In such case there can be no escape from the legal conclusion the suit is, as any suit for like purpose must be, in fact against the government in its legal effect, and that, unless the government shall enter its appearance, no decree as prayed in the bill of complaint may enter.

[2] To this conclusion, under the facts of this case, come all the well-considered authorities on this important subject. A reading and consideration of these authorities controlling here will disclose the cases generally to fall under a few distinct classifications and to be governed by well-settled rules. In some of the adjudicated cases, in which the plea has been interposed that the suit is in legal effect though not in name against the sovereign, where this plea has been denied it will be found to have been based upon the ground that the truth or falsity of the claim made creates a justiciable controversy, and, on the hearing, the court, on the facts, found the asserted claim not established. Thus, in the celebrated case of United States v. Lee, supra, the claim was asserted by the officials of the government, Strong and Kaufman, that the suit was in legal effect one against the United States, and that they were merely acting as officials of the government in dealing with the property of the United States. However, the court, on a hearing and examination of the facts, denied this plea, for at the trial it was found as a fact the property in dispute was the property of Lee and not the property of the United States, and that the officers of the United States attempting to deal with the property, while they were such officials of the United States as they claimed to be, yet they were not dealing with property of the United States but with the property of Lee, to his injury. The reason why immunity was denied in that case is very clearly stated by Mr. Justice Miller, as follows:

"The case before us is a suit against Strong and Kaufman as individuals, to recover possession of property. The suggestion was made that it was the property of the United States, and that the court, without inquiring into the truth of this suggestion, should proceed no further;" "but it certainly can never be alleged that a mere suggestion of title in a state to property in possession of an individual must arrest the proceedings of the court, and prevent their looking into the suggestion and examining the validity of the title. * * * In this case, as in that [U. S. v. Peters, 5 Cranch, 115, 3 L. Ed. 53], after a judicial inquiry had made it clear that the property belonged to plaintiff and not to the United States, we are still asked to forbid the court below to proceed further, and to reverse and set aside what it has done, and thus refuse to perform the duty of deciding suits properly brought before us by citizens of the United States."

In other words, in cases of the character of Lee v. United States, the claim of immunity rests upon the particular facts of the case, and the facts must be examined by the court in which the plea is presented, and, if it be found the plea is not well founded in fact, must be denied.

Another class of cases in which the claim of immunity from suit, on the ground it is in legal effect one against the sovereign without its consent, will be found to be cases brought against parties claiming to have acted or to be acting in their official capacities, under and by virtue of some provision of statutory law, but which, on the hearing of the case, it is determined, as a matter of law, the statutory power on which the claimed officials relied for their office is held to be unconstitutional and void, hence conferred on them no office or no power or authority to act in the premises. The cases falling under this head are very numerous. Osborn v. Bank of United States, 9 Wheat. 738, 843, 868, 6 L. Ed. 204; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; Pennoyer v. McConnaughy, 140 U. S. 1, 10, 11 S. Ct. 699, 35 L. Ed. 363; Scott v. Donald, 165 U. S. 107, 112, 17 S. Ct. 262, 41 L. Ed. 648; Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819; Ex parte Young, 209 U. S. 123, 159, 160;[1] Ludwig v. Western Union Telegraph Co., 216 U. S. 146, 30 S. Ct. 280, 54 L. Ed. 423; Herndon v. C., R. I. & P. R. Co., 218 U. S. 135, 155, 30 S. Ct. 633, 54

[1] 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764.

L. Ed. 970; Hopkins v. Clemson College, 221 U. S. 636, 643–645, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243; American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90.

Still another class of cases in which immunity from suit is claimed and denied on the trial are cases in which actual officials of the government or state are proceeded against for the doing or threatening to do some act in which they claim the authority to so act under and by virtue of their office, but it is determined at the trial such officials were not in doing the act complained of within the scope of their authority as officials of the sovereign, but acting outside of any such official powers; their acts being ultra vires. Such was the case of Philadelphia Co. v. Stimson, 223 U. S. 607, 32 S. Ct. 340, 56 L. Ed. 570; Lane v. Watts, 234 U. S. 525, 34 S. Ct. 965, 58 L. Ed. 1440; Ballinger v. Frost, 216 U. S. 240, 30 S. Ct. 338, 54 L. Ed. 464; and kindred cases.

As the title to the property involved in this controversy is concededly in the United States, and plaintiff was a mere lessee, the rule in the case of the United States v. Lee, supra, and the like cases, have no application. That the honorable Secretary of War was at the time an official of the United States, and was acting for the United States in leasing and dealing with the property in question, there can be and is no possible denial. Therefore the only contention left remaining is that arising under the third classification of cases above mentioned; that is to say: Was his act in canceling the lease and ordering the return of the property to the government ultra vires and void; or, as an official of the United States, and the head of the War Department of the government, was he acting within the scope of his power in declaring the lease contract made between the United States and plaintiff at an end?

The solution of this problem must depend upon the powers and duties of the Secretary of War as the head of the War Department of the government and the terms of the lease contract made between the government and plaintiff.

While it may be conceded, had the lease contained no provision for re-entry and re-taking possession of the property, resort must have been had to some judicial tribunal in such case to ascertain and determine if conditions of the lease had been so broken as to terminate the lease. Again if, on certain conditions specified in the lease, a right of cancellation and recovery of the property were stipulated, but without submitting the question of the happening or nonhappening of such conditions to the judgment or discretion of any one, the question would again become one justiciable by the courts. Now paragraph 8 of the contract of lease in question provides as follows:

"The lessor reserves the right to inspect the plant, fleet, and work at any time to see that all the said terms and conditions of this lease are fulfilled, and that the crews and other employees are promptly paid, monthly or oftener; and noncompliance, in his judgment, with any of the terms or conditions will justify his terminating the lease and returning the plant and said barges and towboats to the lessor, and all moneys in the Treasury or in bank to the credit of the Secretary of War shall be deemed rentals earned by and due to the lessor for the use of said vessels."

[3] Beyond all controversy, by simple plain language this provision of the lease reserved to the government the right, obligation, duty, and power to cancel and abrogate the lease if, in the judgment of the representative of the government vested with power to make the lease, the lessee, in his judgment, was not complying with any of the terms or conditions of the lease; for, the government being an impersonal body or party to the contract, of necessity it could not act except through its lawful representatives. This must have been and was well understood and known by the parties making the lease and that it would be exercised by the appropriate officials of the government in the enforcement of this and other provisions of the contract. The property involved in this controversy was under the control of the Department of War. The rentals of the property were required to be deposited to the credit of the Secretary of War; therefore as the Secretary of War was the head of the department to which the involved property was consigned, it was under his direct and specific power and control to lease as is stated in the lease, and his judgment is the judgment to which paragraph 8 of the contract above quoted relates. So, just so certainly and surely as the decision of questions of dealings with the public domain of our country fall within the control of the honorable Secretary of the Interior, it must be the property of the government constructed for preparations for war out of funds appropriated by Congress come under the control of the Secretary of War.

In this view of the case it must be held this is a suit against officials of the govern-

ment in relation to property owned by the government and under their control as officials of government. Therefore the plea of immunity from suit, because in legal effect against the government itself, in its sovereign capacity, should have been upheld and sustained.

As said by Mr. Justice Pitney, delivering the opinion of the court in Wells v. Roper, 246 U. S. 335, 38 S. Ct. 317, 62 L. Ed. 755: "That the interests of the government are so directly involved as to make the United States a necessary party and therefore to be considered as in effect a party, although not named in the bill, is entirely plain. And the case does not fall within any of the exceptions to the general rule that the United States may not be sued without its consent, nor its executive agents subjected to the control of the court respecting the performance of their official duties. It cannot successfully be contended that any question of defendant's official authority is involved; it is a mere question of action alleged to be inconsistent with the stipulation under which it purported to be taken; nor can it be denied that the duty of the Postmaster General, and of the defendant as his deputy, was executive in character, not ministerial, and required an exercise of official discretion. And neither the question of official authority nor that of official discretion is affected, for present purposes, by assuming or conceding, for the purposes of the argument, that the proposed action may have been unwarranted by the terms of the contract and such as to constitute an actionable breach of that contract by the United States. See Noble v. Union River Logging R. Co., 147 U. S. 165, 171 [13 S. Ct. 271, 37 L. Ed. 123], and cases cited; Belknap v. Schild, 161 U. S. 10, 17, 18, [16 S. Ct. 443, 40 L. Ed. 599]; American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 108 [31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243]; Philadelphia Co. v. Stimson, 223 U. S. 605, 620 [32 S. Ct. 340, 56 L. Ed. 570]."

As has been seen, acting under the express terms of this contract, expressed as clearly as words can express thought, intent, or meaning of the writer, the honorable Secretary of Interior considered and determined the question submitted to his judgment, and gave his decision in favor of the reserved right of the government to cancel the contract.

In Noble v. Union River Logging R. Co., 147 U. S. 165, 13 S. Ct. 271, 37 L. Ed. 123, Mr. Justice Brown stated what the case involved, as follows:

"This case involves, not only the power of this court to enjoin the head of a department, but the power of a Secretary of the Interior to annul the action of his predecessor, when such action operates to give effect to a grant of public lands to a railroad corporation.

"1. With regard to the judicial power in cases of this kind, it was held by this court as early as 1803, in the great case of Marbury v. Madison, 1 Cranch, 137 [2 L. Ed. 60], that there was a distinction between acts involving the exercise of judgment or discretion and those which are purely ministerial; that, with respect to the former, there exists, and can exist, no power to control the executive discretion, however erroneous its exercise may seem to have been, but, with respect to ministerial duties, an act or refusal to act is, or may become, the subject of review by the courts."

In Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60, Mr. Chief Justice Marshall, said: "Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation."

In Wells v. Roper, supra, Mr. Justice Pitney, delivering the opinion for the court, said: "The effect of the injunction asked for would have been to oblige the United States to accept continued performance of plaintiff's contract and thus prevent the inauguration of the experimental service contemplated by the Act of 1914—a direct interference with one of the processes of government. The argument to the contrary assumes to treat defendant not as an official but as an individual who although happening to hold public office was threatening to perpetrate an unlawful act outside of its functions. But the averments of the bill make it clear that defendant was without personal interest and was acting solely in his official capacity and within the scope of his duties. Indeed, it was only because of his official authority that plaintiff's interests were at all endangered by what he proposed to do."

In Riverside Oil Co. v. Hitchcock, 190 U. S. 316, 23 S. Ct. 698, 47 L. Ed. 1074, Mr. Justice Peckham, delivering the opinion for the court, said: "That the decision of the questions presented to the Secretary of the Interior was no merely formal or ministerial act is shown beyond the necessity of argument by a perusal of the foregoing statement of the issues presented by this record for the

decision of the Secretary. Whether he decided right or wrong, is not the question. Having jurisdiction to decide at all, he had necessarily jurisdiction, and it was his duty to decide as he thought the law was, and the courts have no power whatever under those circumstances to review his determination by mandamus or injunction. The court has no general supervisory power over the officers of the Land Department, by which to control their decisions upon questions within their jurisdiction. If this writ were granted we would require the Secretary of the Interior to repudiate and disaffirm a decision which he regarded it his duty to make in the exercise of that judgment which is reposed in him by law, and we should require him to come to a determination upon the issues involved directly opposite to that which he had reached, and which the law conferred upon him the jurisdiction to make."

In the same case it is said: "Neither an injunction nor mandamus will lie against an officer of the Land Department to control him in discharging an official duty which requires the exercise of his judgment and discretion. Marquez v. Frisbie, 101 U. S. 473 [25 L. Ed. 800]; Gaines v. Thompson, 7 Wall. 347 [19 L. Ed. 62]; United States v. Black, 128 U. S. 40 [9 S. Ct. 12, 32 L. Ed. 354]; United States v. Windom, 137 U. S. 636 [11 S. Ct. 197, 34 L. Ed. 811]."

In Decatur v. Paulding, 14 Pet. 497, 10 L. Ed. 559, 609, Mr. Chief Justice Taney, delivering the opinion for the court, said: "We have referred to these passages in the opinion given by the court in the case of Kendall v. United States [12 Pet. 524], in order to show more clearly the distinction taken between a mere ministerial act, required to be done by the head of an executive department, and a duty imposed upon him in his official character as the head of such department, in which judgment and discretion are to be exercised. * * * We are therefore of opinion, that the circuit court was not authorized by law to issue the mandamus, and committed no error in refusing it. And as we have no jurisdiction over the acts of the secretary in this respect, we forbear to express any opinion upon the construction of the resolution in question."

As the decision of the question of the right of the government to cancel the lease was left to the decision, judgment, and discretion of the parties to the lease, the question was withdrawn from the consideration of the courts of the country because it was one determinative of the executive will.

It follows, this suit being in its essential nature, though not in name, a suit involving the disposition of property of the United States, the United States in its sovereign capacity is the real party in interest as defendant, and, being an indispensable party, no decree affecting its interests can go unless it is before the court. Therefore the claim of immunity from suit on this ground should have been granted, and its denial by the court was error.

Again, by the very terms of the contract in suit, the right to cancel and annul the lease for noncompliance therewith by plaintiff was withdrawn from judicial power and was left to the judgment and discretion of the honorable Secretary of War, the representative of the executive power of government. And, in taking jurisdiction and determining the controversy as one of judicial inquiry in our courts, was also error.

It follows the decree entered granting a temporary injunction must be reversed, and the case proceed no further unless the government shall consent to submit its rights under the lease to the court in place of the honorable Secretary of War where the duty of deciding was placed by the parties to the contract.

SYMES, District Judge (concurring). I desire to emphasize a little more fully certain features in the case that appear to me material.

The allegations of the bill are important to consider. It is alleged that the plaintiff, Goltra, had entered into arrangements with the government during the war for the establishment of plants and transportation facilities to increase the output of iron ore, coal, etc., needed in the prosecution of the war; that the United States constructed the nineteen barges involved in this suit, to be used for transportation of iron ore and coal—also necessary towboats; that the termination of the war made it unnecessary to carry out these plans, and negotiations were then had between the plaintiff, Goltra, and the duly authorized representatives of the United States for the disposition of the boats that resulted in the contract in controversy, which it is alleged was entered into between the plaintiff and the United States.

The contract is then set forth. It recites that the United States of America is about to construct a fleet of towboats for the purpose of towing the barges; that it, as lessor, represented by certain officials, charters the boats to the lessee for five years, to

be operated as common carriers upon the Mississippi river, the lessor to regulate the rates to be charged, and the lessee, after paying operating expenses, maintenance, etc., shall deposit the net earnings in a depository, etc., all to the satisfaction and approval of the lessor. Paragraph 8 is important. It provides that the government shall have the right of inspection at any time for the purpose of seeing that the lease is being fully performed, and when, in the judgment of the lessor, noncompliance with any of the terms or conditions justify, it may, without notice, terminate the lease, and take the fleet back. It next alleges that a controversy arose with the Secretary of War over rates to be charged, and admits in effect that complainant did not, as agreed, operate the barges as common carriers, and pleads several excuses for his failure so to do; that John W. Weeks, as Secretary of War, notified lessee under date of March 3d, that in his judgment the latter had not complied with the terms of the contract, in that he had failed to operate the towboats and barges as common carriers, and in other particulars, and he therefore declared the contracts terminated. It is alleged that the action of the Secretary of War, in declaring the contract at an end, was unlawful. It would seem, however, that, a breach by complainant being admitted, this is nothing more than a legal conclusion; no facts being pleaded in support thereof. In short, the gravamen of the bill is that the Secretary of War exercised powers specifically given him by the contract.

At the hearing, correspondence was introduced between Goltra and officials of the government, in which the boats were referred to by plaintiff as the property of the United States, and Goltra himself, under date of April 13, 1922, refers to the contract as one with the United States.

The court below states that, if the United States is the lessor and owner of the boats in controversy, then the plaintiff cannot be heard to dispute its title, and the case must then be dealt with on the question of whether the court can afford any relief, unless the actual lessor is before the court. It comes to the conclusion that the funds with which these boats were built were transferred or loaned by the Emergency Fleet Corporation, and that therefore the legal title to the vessels was in it as trustee for the United States, although the custody and control was in the Secretary of War, and, further, that the United States was the beneficial owner and "both Congress

7 F.(2d)—54

and the United States dealt with these vessels as if the United States not only was the absolute owner of them, but had the legal title to them, also absolutely."

Section 201d of title 2 of the Transportation Act of 1920 (Comp. St. Ann. Supp. 1923, § 10071¼aaa) provides, in effect, that these boats shall be operated by the Secretary of War for the purpose of providing facilities for water carriage on the Mississippi river. Irrespective of who furnished the money, the United States of America, according to the allegations of the bill and the terms of the contract, constructed the barges, and delivered possession of them to the lessee. Further, as the court below points out, the funds with which they were built, while technically they may have been furnished by the Emergency Fleet Corporation, were funds of the United States, appropriated by Congress for the purpose of building ships, and in possession of the Fleet Corporation only to the extent that the latter was an instrumentality of the government, and transferred by order of the President to the Chief of Engineers for the purpose of building these vessels.

But an inquiry into the source of the funds seems irrelevant on the question of title, in view of the plaintiff's admission that the government built the boats, delivered them to him, exercised dominion over them, and that he acted at all times on the assumption that he was dealing with the United States as owner. It would therefore seem that plaintiff is estopped from denying that the United States is owner, subject only to such rights as he had as lessee. It may be that the contract put plaintiff at the mercy of the Secretary of War, but the court cannot relieve him from a bad bargain. The agreement expressly vested in the government, or the Secretary of War, the right in his discretion to terminate it for failure to perform. The courts cannot control the exercise of such discretion, when the authority to do the act is not challenged. Philadelphia Co. v. Stimson, 223 U. S. 605, 32 S. Ct. 340, 56 L. Ed. 570, is not in point. Justice Hughes there says at page 620, that the complainant did not ask the court to interfere with the official discretion of the Secretary of War, but challenged his authority to do the things of which complaint was made. The converse is true in the case at bar.

In Noble v. Union River Logging R. Co., 147 U. S. 165, 13 S. Ct. 271, 37 L. Ed. 123, the court at page 171, citing Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60, states

that no power exists to control executive discretion, no matter how erroneous its exercise may be. This case is in point here, as this contract, gave the Secretary of War the right to use his judgment in deciding whether there had been a breach or not, and the specific breach cited by him in his letter of March 3d, declaring the contract terminated, is admitted by the bill, and fully established by the evidence. There is neither allegation nor testimony that Goltra performed.

If we grant, as I think we must, that it was the Secretary of War's duty to exercise executive power and discretion generally over vessels built by the United States for war purposes, and which was specifically granted by the terms of this contract, then our inquiry is at an end.

The case at bar on the facts is similar to Wells v. Roper, 246 U. S. 335, 38 S. Ct. 317, 62 L. Ed. 755. The court said, at page 337 (38 S. Ct. 317): "And the case does not fall within any of the exceptions to the general rule that the United States may not be sued without its consent, nor its executive agents subjected to the control of the courts respecting the performance of their official duties."

And at page 338 (38 S. Ct. 318): "And neither the question of official authority nor that of official discretion is affected, for present purposes, by assuming or conceding, for the purposes of the argument, that the proposed action may have been unwarranted by the terms of the contract and such as to constitute an actionable breach of that contract by the United States."

That was a case where it was sought, as it is here, to prevent an officer of the government from annulling a contract, or from further interfering with its performance, and it was held that such a suit was one against the United States, although it was not named as a party, and therefore could not be maintained.

Minnesota v. Hitchcock, 185 U. S. 373, 22 S. Ct. 650, 46 L. Ed. 954, and In re Ayers, 123 U. S. 443, 8 S. Ct. 164, 31 L. Ed. 216, show that the courts look at the whole record in deciding whether the United States is a real party or not, and should decide the question whether it is so named or not. See, also, Stanley v. Schwalby, 162 U. S. 255, 16 S. Ct. 754, 40 L. Ed. 960.

United States v. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171, is relied upon by appellees. But, as Mr. Justice Miller points out there, the United States went so far as to contend that, though it did not have any title to the land in controversy, and what it set up as a title was no title at all, the court could not render judgment in favor of the plaintiff and against the defendants, because the latter held the property as officers of the United States. This argument was rejected by the court, because, it being clear that the title to the property in question had always been in the plaintiffs, it followed that the acts of any government officials in taking and holding possession was trespass pure and simple, and they could not avail themselves of the immunity of the United States from suit. Further, as the court said, it was not alleged, and could not be contended, that Congress or the President had any lawful authority to take possession of the property in question. See, also, Belknap v. Schild, 161 U. S. 11, 16 S. Ct. 443, 40 L. Ed. 599.

Sloan Shipyards v. U. S. Fleet Corp., 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 769, is also relied upon by appellee. But it differs from the one at bar because the defendant, the Fleet Corporation, was held to be a separate entity, incorporated under the laws of the District of Columbia. The court found that the bill stated a cause of action against the Corporation, because it could not be assumed from the allegations of the bill alone that the taking possession of the property in question by the Fleet Corporation was in pursuance of powers delegated to it by the President at the time that act occurred, or that it was included within the ratification of the past acts of the Fleet Corporation made by executive order.

In Dakota Central Telephone Co. v. South Dakota, 250 U. S. at page 184, 39 S. Ct. 507, 509, 63 L. Ed. 910, 4 A. L. R. 1623, the Supreme Court reiterates that the motive or mere abuse of discretion by a government official in exerting a power given, involves considerations that are beyond the reach of the judicial power, and that the judiciary may not invade the executive department for the purpose of correcting alleged mistakes or wrongs arising from an asserted abuse of discretion.

I cannot find on this record that the government officials arbitrarily interfered with property of the plaintiff. The boats were not his property, and his limited right of possession was lost by his failure to operate them. Before they were seized, there were negotiations between the parties, and he was notified that the government would exercise its rights under the contract.

In conclusion, it must be remembered that the whole object of the United States in

leasing these boats was to have them operated for the benefit of shippers in the Mississippi Valley; that Goltra attempted only two trips on the river, and then tied them up at the wharf in St. Louis. The shipping public were complaining of the lack of service, so the government then took possession in order to turn them over to a lessee who would give service to the public.

It would therefore seem that the motion to dismiss and to quash the temporary restraining order should have been granted.

SANBORN, Circuit Judge (dissenting). When the controversy that resulted in this suit in equity arose, the plaintiff was in lawful possession of the four towboats and nineteen barges. The lease and contract of sale of May 28, 1919, and the delivery of possession of the vessels to him on July 15, 1922, had vested in him the lawful possession of the property and the absolute optional right by a compliance with the terms of the contract to the continuous possession and to the legal title to this property at any time prior to July 15, 1927, the time of the expiration of the term of the lease and con·tract of sale. He was in the position of an optional vendee of real or personal property to whom the vendor, bound by his contract to convey on payment by the vendee in the future of the unpaid part of the purchase price, has delivered the possession of the property. In equity he was the option·al owner in lawful possession of the property, and the vendor held the legal title to it as trustee for him, the cestui que trust.

The contract of lease and sale recited that the barges and towboats were to be constructed by the United States for, and adapted to, the transportation of iron ore and coal, but when they were delivered to the lessee and optional vendee, about July 15, 1922, they were so defective that he was compelled to expend and did expend $40,000 of his own money to make them operative. That contract provided that he should operate these vessels as a common carrier on the Mississippi river and its tributaries "at rates not in excess of prevailing rail tariffs, and not less than the prevailing rail tariffs without the consent of the Secretary of War," and that the lessor reserved the right to inspect the plant, fleet, and work to see that the terms and conditions of the lease were fulfilled and that "noncompliance, in his judgment, with any of the terms or conditions will justify his terminating the lease and returning the plant and said barges and towboats to the lessor."

On March 3, 1923, the defendant Hon. John W. Weeks, Secretary of War, without notice to or hearing of the plaintiff on the question of his compliance with the terms of the contract, in writing notified him that, in his judgment, he had not complied with them, in that he had failed "to operate the said towboats and barges as a common carrier and in other particulars," but none of these other particulars was described, and he declared the contract terminated and directed the plaintiff to deliver possession of the vessels to the defendant Col. T. Q. Ashburn, who was authorized by him to receive and receipt for them. There was a "Memorandum for Colonel Ashburn" attached to this written notice, whereby the latter was directed to deliver to the plaintiff in person the notice and to demand the possession of the property, the last paragraph of which read in this way: "In the event of his failure or refusal to make delivery of the property demanded, you will apply to the United States District Attorney at St. Louis, requesting the institution of legal proceedings for the recovery of said property."

If this direction had been put into effect, and such legal proceedings had been instituted, it seems probable that the rights of the plaintiff, the defendants, and the United States would have been finally determined before this date and continuing litigation would have been avoided.

On March 8, 1923, the plaintiff in writing answered the demand for possession of the property. The pertinent portion of that answer was in these words:

" * * * Most respectfully, I decline to comply with your demand. To do so would deprive me, without any notice whatever, or opportunity to be heard, of rights and property lawfully acquired at a very large expenditure by me of time and money. I have, in face of most unjust interference and restrictions, fully complied with all of the terms of my contract, and, further, I have complied with every demand or requirement made of me by either you or the Chief of Engineers of the United States, the lessor named in my contract.

"The exercise of your judgment is, I am convinced, based upon inadequate and inaccurate information and has in fact no substantial basis on which to rest. This I believe will be fully demonstrated to you if I am granted a fair and impartial hearing to which, as a citizen, I am entitled, and which, in fairness and justice, I now request.

"Very respectfully yours,
"Edward F. Goltra."

The record discloses no reply to this answer and courteous request for a hearing, but without either, on Sunday, March 25, 1923, the defendants, without the consent and against the protest of the plaintiff's agents in possession of the vessels, with a coercing force of men, took possession of the boats and barges at St. Louis, Mo., and ran them down the river, and held them upon the Illinois side thereof, in the belief that the District Court below had no jurisdiction over that portion of the Mississippi river between Missouri and Illinois adjacent to the Illinois bank. As soon as this sudden Sunday seizure came to the knowledge of counsel for the plaintiff, they prepared and presented to the court below his bill in equity against the defendants, wherein he prayed for a restraining order and an interlocutory injunction against them for the purpose of holding the property in the possession of the plaintiff in the state in which it was before the sudden Sunday seizure, until the claims of the respective parties thereto could be fairly heard, considered and decided.

The only specific charge in the demand for possession of these vessels was that the plaintiff had not operated the vessels as a common carrier. In his bill in equity the plaintiff alleged that, by the provisions of the lease and contract, the defendant, the Secretary of War, had the control of the rates which the plaintiff might charge for transportation of commodities by the use of these vessels, that he obtained contracts for the transportation of immense quantities of commodities at reasonable rates, but that the defendant, the Secretary of War, by the use of the power over his rates, vested in him by the lease and contract, prohibited him from operating or refused him the necessary permission to carry commodities at operative rates, either as a common carrier or as a private carrier, and thereby arbitrarily deprived him of the opportunity to carry out his contracts with shippers, and made it absolutely impossible for him to operate the vessels, either as a common carrier or otherwise.

The plaintiff prayed for an immediate restraining order, an interlocutory injunction against the sudden seizure, removal, and possession of this property by the defendants, and for an ultimate determination by the court below of his right to the possession and his equitable interest in this property. On this bill, and the facts which have been recited, his counsel immediately invoked the exercise by the court below of its judicial discretion to preserve the status and possession of this property by its restraining order and its interlocutory injunction as they existed prior to the defendants' seizure, until there could be a hearing, consideration, and decision by the court of some of the rights and equities of these parties. The plaintiff was met, not by answers by the defendants to the merits of the bill, but by a claim in their returns to the order to show cause why the injunction should not issue that the court had no jurisdiction of the suit because the United States was a necessary party to it, and by a claim that the Mississippi-Warrior Service, a barge line which the United States was operating on the Mississippi river, and to prevent the plaintiff's competition with which he alleges in his bill he was informed that the Secretary of War had prevented his use of operative rates, had offered to use his barges and towboats and to pay him fair compensation for such use. But his acceptance of such an offer would not have constituted a performance of his contract to operate these boats and barges as a common carrier or otherwise. He was also met by the suggestion of the Attorney General of the United States that the nation was a necessary party to this suit, and, by his motion, appearing only for the purpose thereof, to dismiss this suit on that ground. The District Judge below patiently heard the claims and arguments of the parties to this suit, deliberately and exhaustively considered them, denied the motion to dismiss the suit, and granted the restraining order and the interlocutory injunction and wrote careful opinions, in which he clearly set forth his reasons for his action.

This case is in this court on an appeal from his order granting the interlocutory injunction. The decisive question presented to him upon the application for that injunction was whether or not in the exercise of his judicial discretion he ought or ought not by his injunction to hold these vessels temporarily until there could be a fair hearing and just decision of some of the important issues in this case in the position and situation in which they were when defendants seized them. By the established principles and rules of equity jurisprudence, the authority was granted to, and the duty, which he could not lawfully renounce or evade, was imposed upon him, and was not granted or imposed upon this court or its members, to decide this question according to his judicial discretion. Denver & Rio Grande R. Co. v. United States, 124 F. 156,

160, 59 C. C. A. 579. And the question for this court in this case is not whether or not it or its members would have exercised his judicial discretion in the way the judge below exercised it, but it is only whether or not he improvidently, illegally, or abusively exercised that discretion. Stearns-Roger Mfg. Co. v. Brown, 114 F. 939, 941, 942, 52 C. C. A. 559, and cases there cited; Denver & R. G. R. Co. v. United States, 124 F. 156, 160, 59 C. C. A. 579.

An indisputable rule for the guidance of the court below, in the exercise of his sound judicial discretion in this case, was and is that an interlocutory injunction maintaining the existing condition of the property may properly issue whenever the questions of law or fact to be ultimately determined in the suit are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss or inconvenience to the opposing party will be comparatively small, and · may well be indemnified by a proper bond if the injunction is granted. Georgia v. Brailsford, 2 Dall. 402, 406, 407, 1 L. Ed. 433; Magruder v. Belle Fourche Valley Water Users Ass'n, 219 F. 72, 82, 135 C. C. A. 524; Denver & Rio Grande R. Co. v. United States, 124 F. 156, 161, 59 C. C. A. 579; City of Newton v. Levis, 79 F. 715, 718, 25 C. C. A. 161; Allison v. Corson, 88 F. 581, 584, 32 C. C. A. 12; Stearns-Roger Mfg. Co. v. Brown, 114 F. 939, 944, 52 C. C. A. 559; Harriman v. Northern Securities Co. (C. C.) 132 F. 464, 476, 477, 480, 485; Carpenter v. Knollwood Cemetery (C. C.) 188 F. 856, 857; Wilmington City Ry. Co. v. Taylor (D. C.) 198 F. 159, 198; Chew v. First Presbyterian Church (D. C.) 237 F. 219, 222; American Smelting & R. Co. v. Bunker Hill & S. Min. & C. Co. (D. C.) 248 F. 172, 182. The District Judge without doubt followed this rule. He took an ample indemnifying bond as a condition of the issue of the injunction, and the question of jurisdiction alone seems to have been sufficiently grave and difficult, in view of the circumstances surrounding the seizure by the defendants to warrant his action. In Ex parte in the Matter of the United States, as Owner of Nineteen Barges and Four Towboats, 263 U. S. 389, 393, 44 S. Ct. 130, 68 L. Ed. 351, the Supreme Court denied an application of the United States for a writ of prohibition to forbid the District Judge below from enforcing his injunction against the defendants in the case in hand on the ground that the United States was a necessary party to this suit, and said:

"The merits of the case present interesting questions. The question of remedy is, however, the more insistent. Does the case justify it? Prohibition is a remedy of exigency and in exclusion of other process of relief. It is directed against unwarranted assumptions of jurisdiction or excesses of it. In some cases there may be instant judgment that such is the situation and the writ granted. In other cases there may be doubt and the writ denied. Ex parte Muir, 254 U. S. 522, 534 [41 S. Ct. 185, 65 L. Ed. 383]. And doubt in the instant case would seem to be justified, for two District Courts [referring to the court below and the District Court for the Northern District of West Virginia in United States Harness Co. v. Graham, 288 F. 929] have decided that, under circumstances such as presented in this case, it does not involve or constitute a suit against the United States. And also the writ is to be denied if there be remedy against the action complained of by appeal."

Moreover, the United States acts and can act, contract, and estop itself only by the acts, contracts, and estoppels that are authorized or wrought by its officers or agents. In the opinion of the writer, by their action in this case the United States made William M. Black the lessor and vendor of the property, vested the legal title · to it in him and the possession and equitable title in it in the plaintiff, represented and held him out as competent to make the terms of the lease and contract obligatory upon him and upon the property and enforceable by the courts in suits against him and his assigns without making the United States a party to such litigation. It does not appear, and it is improbable, that the plaintiff would ever have made this lease and contract with United States, reserving to itself the right to exempt itself and the property from the jurisdiction and power of the courts to enforce the terms of the contract obligatory upon it, and it seems to the writer that the United States and the lessor Black and his successors in interest are estopped by this lease and contract and their acts in placing and holding out the property as subject to its enforceable terms from preventing the plaintiff from protecting his rights and interests therein by suits against Black, the lessor, and his assigns on the ground that the United States is a necessary party thereto. If, on the other hand, the United States or the defendants, by the plea that the former is a necessary party to all suits to enforce or protect the

rights of the plaintiff in this property, its possession, the lease and contract concerning it, and by the refusal of the United States to become a party to any such suits or to bring suit itself, may defeat all such suits without regard to their merits, the plaintiff is left practically remediless, and his lease and contract become practically a deceitful sham. Again, the lease and contract of sale, and the rights of all parties in interest thereunder, arose from and evidence business or commercial transactions. In none of them was or is the United States acting as a sovereign in governing the nation or the people of the nation. The entire transaction, and any interest it may have in it, and the property involved as against the plaintiff, is a commercial and business and not a governmental matter. As against him it stands in the relation of a private party, divested of its privileges and immunities as a sovereign, and hence, of its privilege of exemption from suit against the party it made the lessor in this contract and amenable to the suits to enforce it. Bank of United States v. Planters' Bank of Georgia, 9 Wheat. 904, 6 L. Ed. 244.

Moreover, the jurisdiction of the court is not the only serious question in this case. On the day this suit was commenced, and for more than a year before that day, the vessels were in the possession of the plaintiff under the lease and contract of sale, which contained the provision that noncompliance by the lessee in the judgment of the lessor, William M. Black, Chief of Engineers, directed by the Secretary of War to represent the United States, with any of the terms or conditions of the lease, would justify his terminating and returning the property to the lessor. It will be noticed that the only condition that would justify the termination of the lease and the return of the property to the lessor was the noncompliance by the lessee in the judgment of the lessor Black with the terms of the lease, while the defendants' claim to possession rests on noncompliance in the judgment of Hon. John W. Weeks, Secretary of War. The large value of the property subject to this lease and contract, the serious effect of the decision to be rendered by the judgment of Mr. Black, leave no doubt in the mind of the writer that the plaintiff intrusted this decision to, and relied upon, the individual wisdom, experience, knowledge, just and deliberate fairness of Mr. Black. The record does not disclose any decision of this question of noncompliance by him, or any consent or agreement by the plaintiff to substi-

tute the judgment of Hon. John W. Weeks, Secretary of War, or of any other person or officer for that of Mr. Black; and it seems to the writer that the judgment of Mr. Weeks, the Secretary of War, was not binding upon the plaintiff, was unauthorized and ineffective. When two opposite parties agree to submit a controversy between them to the judgment of a chosen arbiter in whose fairness, wisdom, deliberation, and discrimination they have confidence and to abide by his decision, the consent and agreement of both is indispensable to the substitution of another individual as arbiter in his place.

Again, the possession of this property, the optional right to purchase it on the terms prescribed by the contract, each of them constituted valuable property of the plaintiff vested in him under the contract. If the authority to take this property from the plaintiff, when in his judgment the latter failed to comply with any of the terms of the lease and contract had been given to Hon. John W. Weeks, Secretary of War, as in the opinion of the writer it was not, the exercise of that authority and the taking of the possession and the property would have been conditioned by the fair, deliberate, and judicial exercise of his judgment after reasonable opportunity for the plaintiff to present the pertinent facts and to be heard concerning his compliance with the terms of the contract. An arbitrary declaration or decision of the Secretary that in his judgment the plaintiff had failed to comply with the terms, without prior notice to him of the Secretary's proposed consideration of that question, without opportunity for him to present to the Secretary his claim that he had complied, and the facts and reasons upon which he based that claim, and without thoughtful, fair, and deliberate consideration of those facts and reasons before forming his judgment, it seems to the writer would not have warranted a judgment by the Secretary that the plaintiff had not complied with the terms of his contract. The plaintiff alleges in his complaint that no such notice or opportunity for him to present the facts and reasons why he had complied was given to him before the Secretary formed his alleged judgment, nor before his seizure of the property, although by the plaintiff's letter to the Secretary of March 8, 1923, he courteously requested such a hearing by the Secretary.

The Fifth Amendment of the Constitution of the United States states: "No per-

son shall * * * be deprived of life, liberty, or property, without due process of law. * * * " This provision of the Constitution forbids citizens, officers, courts, and the United States itself, from depriving any person of his property without due process. Notwithstanding the provision in the lease and contract that William M. Black, the lessor, on noncompliance, in his judgment, by the plaintiff, with any of the terms of the lease and contract would be justified in terminating the lease and returning the property to the lessor, the writer is unable to bring his mind to the conclusion that the acts of the defendants in this case, the notice of Hon. John W. Weeks, Secretary of War, of March 3, 1923, that, in his judgment, the plaintiff had not complied with the terms of the lease and contract and his peremptory demand that the plaintiff surrender the property, his failure to give notice of or an opportunity for a hearing before him by the plaintiff on the question of the latter's compliance with the terms of the contract, either before or after the plaintiff by his answer to the Secretary's letter of March 3, 1923, requested such an opportunity and hearing by his letter of March 8, 1923, the sudden, coercing seizure and taking from the plaintiff of much of this property on Sunday, and the attempt to run it beyond the jurisdiction of the court below, constituted due process of law. To the writer they look more like an attempt to avoid or evade due process of law.

The questions of law and equity, to which reference has now been made, in the mind of the writer are grave and difficult, and, in view of them, the judge below was required to and did exercise his judicial discretion in issuing the interlocutory injunction. On this appeal from the order for its issuance, the only question judicable by this court is whether or not the order for the injunction and the record in this case evidence an unlawful, improvident, or abusive exercise of his sound judicial discretion. As has been said earlier in this opinion, the law imposed upon him the duty to exercise this discretion, and the responsibility for its exercise, and left him wide latitude for action within the rules prescribed for his guidance. Neither that discretion nor the exercise of it was intrusted to this appellate court or to either of its members, and, in the opinion of the writer, it ought not to interfere with that exercise by the judge below to whom it was intrusted, unless an improvident, careless, or unreasonable exercise of it, violative of the rules of law which should have guided his action, has been committed. Blount v. Société Anonyme du Filtre, etc., before Circuit Judges, afterwards Justices of the Supreme Court, Taft and Jackson, 53 F. 98, 99, 100, 101, 3 C. C. A. 455; Stearns-Roger Mfg. Co. v. Brown, 114 F. 939, 941, 942, 52 C. C. A. 559.

For the reasons stated above, the writer is not convinced that anything of this nature characterized the action of the court below in the granting of this injunction, and he is unable to resist the conclusion that the order for it ought to be affirmed.