## BALLINGER, SECRETARY OF THE INTERIOR, *v.* UNITED STATES EX REL. FROST.[1]

ERROR TO THE COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA.

No. 54.   Argued December 8, 1909.—Decided February 21, 1910.

The power of supervision and correction vested in the Secretary of the Interior over Indian allotments is not unlimited and arbitrary; it cannot be exercised to deprive any person of land the title to which has lawfully vested.

However reluctant the courts may be to interfere with the executive department, they must prevent attempted deprivation of lawfully acquired property and it is their duty to see that rights which have become vested pursuant to legislation of Congress are not disturbed by any action of an executive officer.

---

[1] Docket title: No. 54.   James Rudolph Garfield, Secretary of the Interior, *v.* The United States of America *ex rel.* Frost.

The head of a department of the Government is bound by the provisions of congressional legislation which he cannot violate, however laudable may be his motives.

After all the requirements of the act of Congress providing for distribution of Indian lands have been complied with, and the statutory period has elapsed without contest, the title of the allottee becomes fixed and absolute and only the ministerial duty of execution and delivery of the patent remains for the Secretary of the Interior.

The performance of a ministerial duty by an executive officer can be compelled by mandamus; and so held as to the delivery of patent to land selected by a Cherokee Indian allottee after all requirements of the acts of Congress under which the selection was made had been complied with.

30 App. D. C. 165, affirmed.

THE facts are stated in the opinion.

*Mr. Assistant Attorney General Harr* for plaintiff in error:

Although mandamus will issue against an executive officer to do a purely administrative act in which he has no discretion it will not issue as to any duty involving any discretion. *United States* v. *Black,* 128 U. S. 40, 48; *Riverside Oil Co.* v. *Hitchcock,* 190 U. S. 316, 335.

In this case it was necessary for the Secretary to decide whether the land was allottable and if so to the allottee or the town dweller.

The supervisory power of the Secretary of the Interior arises from the Revised Statutes and the express terms and necessary implication of the allotment acts. Rev. Stat., §§ 441, 463; Act of June 28, 1898, 30 Stat. 506; § 24, Act of July 1, 1902, 32 Stat. 641, 644; Act of May 31, 1900, 31 Stat. 221, 236; Act of March 3, 1903, 32 Stat. 982, 996; 25 Op. Atty. Gen. 460, 464; *West* v. *Hitchcock,* 205 U. S. 80, 84.

That the Secretary's approval is necessary has therefore been determined by two departments—the one charged with administration of these acts and the other charged with construction of statutes for advice of the Executive. A settled construction by the departments will not be overturned by

the courts unless clearly wrong. *United States* v. *Healy,* 160 U. S. 136, 145; *Hewett* v. *Schultz,* 180 U. S. 139, 157; *United States* v. *Finnell,* 185 U. S. 236, 244.

The supervisory power of the Secretary of the Interior continues until ultimate, final action, whereby the title passes— that is, until his approval of the patent and authorization of its delivery. *Hy-yu-tse-mil-ken* v. *Smith,* 194 U. S. 401; *West* v. *Hitchcock, supra.* And see also as to the extent of supervisory power of the Secretary: *Knight* v. *Land Association,* 142 U. S. 161, 177; *Orchard* v. *Alexander,* 157 U. S. 372, 381; *Stoneroad* v. *Stoneroad,* 158 U. S. 240, 249; *Williams* v. *United States,* 138 U. S. 514; *Iron Co.* v. *United States,* 165 U. S. 379; *Wallace* v. *Adams,* 204 U. S. 415; and see case below, 143 Fed. Rep. 716, 720.

The Secretary of the Interior never authorized allotment of this tract. Determination as to whether it was allottable or not was under his consideration until October 23, 1905, when he decided in the negative.

The allotment certificate no more passes title than does the final certificate upon a public-land entry. Until patent issues and title passes, the right to the title is subject to investigation; equitable rights come within the cognizance of the Secretary, and the final receipt, or its analogue, the allotment certificate, may for good cause be annulled. *Guaranty Savings Bank* v. *Bladow,* 176 U. S. 448, 453; *Michigan Lumber Co.* v. *Rust,* 168 U. S. 589, 592, 593; *Barden* v. *Northern Pacific R. R. Co.,* 154 U. S. 288, 326, 327.

Until the legal title passes from the Government inquiry as to equitable rights comes within the cognizance of the Land Department. *Brown* v. *Hitchcock,* 173 U. S. 473, 478; *Oregon* v. *Hitchcock,* 202 U. S. 60, 70.

The Secretary of the Interior was, from the first legislation looking to dissolution of tribal relations of the Five Civilized Tribes, made supervising head of all agencies to effect that policy, and the magnitude of the work was such that some supervising head was necessary.

The magnitude of the work appears when it is considered that these acts involved disposal of 28,440 square miles— 18,202,000 acres—(Annual Rep. Sec'y Interior, 1902, part 1, pp. 596, 597) inhabited in 1900 by 355,225 people (12th Census, vol. I, p. XVIII), estimated in 1906 at 750,000, of which only 92,122 were citizens of Indian tribes. (Report Com. Ind. Affairs, 1906, p. 148.) Less than one in eight could claim title as Indians to the land they inhabited.

The Secretary's decision made such disposal of the land as a court having jurisdiction in like case must inevitably have made, as the only just, proper, or lawful disposal of the land.

*Mr. Charles H. Merillat,* with whom *Mr. Charles J. Kappler, Mr. H. C. Potter* and *Mr. E. A. Walker* were on the brief, for defendant in error:

The Secretary of the Interior having refused to add the land in controversy to the town site of Mill Creek and that being within his discretion his decision is not open to review. But having acted he thereafter could not reverse himself subsequent to defendant in error acquiring a sole indefeasible right in the land. *Linn* v. *Belcher,* 24 How. (U. S.) 526; *Steel* v. *St. Louis Smelting Co.,* 106 U. S. 228; *Johnson* v. *Towsley,* 13 Wall. 83; *Noble* v. *Union River Logging Co.,* 147 U. S. 170.

Defendant in error had acquired a vested interest of which she cannot be deprived by the Secretary of the Interior or any other tribunal save a court of equity, for good cause and in accordance with settled procedure in equity. *United States* v. *Schurz,* 102 U. S. 169; *Wallace* v. *Adams,* 143 Fed. Rep. 716; *Cornelius* v. *Kessel,* 128 U. S. 456.

Executive officers derive their powers from the statutes. Not only must an officer have jurisdiction of the subject-matter but he must also keep within the limits of the power conferred on him by statute. Where the statute defines he cannot, under the name of administration, make law. *United*

*States* v. *Thurber*, 28 Fed. Rep. 56; *United States* v. *McDaniel*, 7 Pet. 1, 14.

After issuance of the allotment certificate the issuance of a patent as a more formal muniment or evidence of title was but a ministerial act, performance of which will be coerced. *United States* v. *Stone*, 2 Wall. 535.

An act is none the less ministerial because the person performing it may have to satisfy himself that the state of facts exists under which it is his right and duty to perform the act. *Flournoy* v. *Jeffersonville*, 17 Indiana, 169; *Crane* v. *Camp*, 12 Connecticut, 463; *Roberts* v. *Valentine*, 176 U. S. 221; *West* v. *Hitchcock*, 19 App. D. C. 333; *Barney* v. *Dolph*, 97 U. S. 397; *Frasher* v. *O'Connor*, 115 U. S. 315.

The allotment certificate is declared by statute to be "conclusive evidence" of the holder's right to the land. It comprises an adjudication and conveyance of the allottee's right to the land. *Wallace* v. *Adams*, 204 U. S. 415, distinguished.

MR. JUSTICE BREWER delivered the opinion of the court.

The defendant in error, a citizen and resident of the Choctaw Nation in the Indian Territory, whose enrollment had been approved by the Secretary of the Interior, and who was entitled to an allotment under the acts of Congress, on December 20, 1906, filed her petition in the Supreme Court of the District of Columbia for a mandamus compelling the Secretary of the Interior to deliver, or cause to be delivered, to her a patent to a tract of land consisting of forty acres, located in the Choctaw Nation in the Indian Territory, and which she had selected in accordance with law. The then Secretary of the Interior, Ethan A. Hitchcock, filed an answer, giving his reasons for declining to issue the patent. Subsequently, James R. Garfield becoming Secretary of the Interior, was substituted as defendant, and filed an amended answer. A demurrer to the amended answer having been sustained,

judgment was entered as prayed for, which was affirmed by the Court of Appeals of the District, and thereupon the case was brought to this court. After the record had been filed in this court, and during the present term, Richard A. Ballinger, the successor of Secretary Garfield, was substituted for him as plaintiff in error.

The facts essential to a decision are briefly these: By treaty between the Choctaw Nation and the United States, dated September 27, 1830 (7 Stat. 333), and the proclamation of the President of the United States of February 24, 1831, the United States caused "to be conveyed to the Choctaw Nation a tract of country west of the Mississippi River, in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it." By subsequent treaties and agreements the Choctaw and Chickasaw Nations were consolidated. The nations have not become extinct, and are still resident on the lands. The act of June 28, 1898, c. 517 (30 Stat. 495), authorized the allotment of the land to the Choctaws and Chickasaws in fair and equal proportions, and provided that this should be done under the direction of the Secretary of the Interior; also, that as soon as practicable after the completion of the said allotment the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation should jointly execute under their hands and the seals of their respective nations and deliver to their allottees patents conveying to them all the right, title and interest of the Indians in and to the lands allotted. The act of May 31, 1900, c. 598 (31 Stat. 221), also authorized the Secretary of the Interior to lay out, survey and plat the sites of such towns as then had a population of two hundred or more, and that he might, upon the recommendation of the Commission to the Five Civilized Tribes, at any time before the allotment set aside and reserve, not exceeding 160 acres in any one tract, at such stations as were or should be established on the line of any railway which should be constructed or be in process of construction in or through either of said nations

prior to the allotment of the lands therein. These townsite provisions were incorporated into the act of March 1, 1901, c. 675 (31 Stat. 848, 851).

On October 26, 1900, the townsite of Mill Creek, containing 155.45 acres, on which there was a railway station, was designated and laid out. The land in controversy is adjacent to that townsite. Section 45 of the act of July 1, 1902, c. 1362 (32 Stat. 641), authorized an addition to such townsites on the recommendation of the Commission to the Five Civilized Tribes, not exceeding 640 acres, and the appropriation act of March 3, 1903, c. 994 (32 Stat. 982, 996), appropriated $25,000 to pay the townsite expenses, with this proviso:

"That the money hereby appropriated shall be applied only to the expenses incident to the survey, platting, and appraisement of townsites heretofore set aside and reserved from allotment: *And provided further*, That nothing herein contained shall prevent the survey and platting at their own expense of townsites by private parties where stations are located along the lines of railroads, nor the unrestricted alienation of lands for such purposes, when recommended by the Commission to the Five Civilized Tribes and approved by the Secretary of the Interior."

On February 17, 1903, the Commission to the Five Civilized Tribes made recommendation that this adjacent land be segregated as an addition to Mill Creek, under the provisions of the act of July 1, 1902, *supra*. This recommendation having been approved by the Commissioner of Indian Affairs, was by him transmitted to the Secretary of the Interior, who, on March 18, 1903, addressed a letter to the Commission, reciting the segregation of Mill Creek townsite on October 26, 1900, and the recommendation of the Commission approved by the Commissioner of Indian Affairs, and said: "The department does not deem it advisable to make the recommendation in view of the act of March 3, 1903." On July 23, 1903, the relator selected as her allotment the land in controversy, upon

which were her buildings and improvements. This was received by the Commission, and nine months thereafter, the time prescribed by statute for contest (act July 1, 1902, *supra*) having elapsed, and no contest of her right to the designated allotment having been made, a certificate of allotment was issued and delivered to her. Thereafter the principal chief of the Choctaw Nation and the governor of the Chickasaw Nation jointly executed a patent under the seals of their respective nations, conveying to her the title of said nations in and to said forty acres of land. Sections 23 and 24 of the act of July 1, 1902, *supra*, read as follows:

"Sec. 23. Allotment certificates issued by the Commission to the Five Civilized Tribes shall be conclusive evidence of the right of any allottee to the tract of land described therein; and the United States Indian agent at the Union Agency shall, upon the application of the allottee, place him in possession of his allotment, and shall remove therefrom all persons objectionable to such allottee, and the acts of the Indian agent hereunder shall not be controlled by the writ or process of any court.

"Sec. 24. Exclusive jurisdiction is hereby conferred upon the Commission to the Five Civilized Tribes to determine, under the direction of the Secretary of the Interior, all matters relating to the allotment of land."

The Secretary alleged in his answer that after the issue of the allotment to relator, and on or about March 11, 1905, his predecessor in office was advised that the land had then and prior to its selection by petitioner been under urban occupancy, and on June 19, 1905, he ordered an investigation, and finding such to be the fact, and that the inhabitants had expended large sums in building upon and improving their tracts and were entitled to be protected, he did, on October 23, 1905, by virtue of the powers in him vested, segregate the lands for townsite purposes and cancel petitioner's allotment thereof, with leave to select other lands to fill her right to tribal lands in severalty. The patent that had previously been exe-

cuted for delivery to her was returned and remained on file
in the office of the Commissioner of Indian Affairs to be can-
celed.

The Interior Department has general control over the
affairs of the Indians—wards of the Government. In addi-
tion, the Secretary of the Interior was by these several
acts specially charged with the duty of supervising the ac-
tion of the Commission to the Five Civilized Tribes in making
the allotments authorized by those acts. On both of these
grounds he claims authority to have done what he did, and
that his acts in that respect are not subject to review by the
courts. We have no disposition to minimize the authority
or control of the Secretary of the Interior, and the court
should be reluctant to interfere with his action. But as said
by Mr. Justice Field in *Cornelius* v. *Kessel,* 128 U. S. 456,
461:

"The power of supervision and correction is not an unlim-
ited or an arbitrary power. It can be exerted only when the
entry was made upon false testimony, or without authority
of law. It cannot be exercised so as to deprive any person
of land lawfully entered and paid for. By such entry and
payment the purchaser secures a vested interest in the prop-
erty and a right to a patent therefor, and can no more be de-
prived of it by order of the Commissioner than he can be de-
prived by such order of any other lawfully acquired property.
Any attempted deprivation in that way of such interest will
be corrected whenever the matter is presented so that the
judiciary can act upon it."

See also *Orchard* v. *Alexander,* 157 U. S. 372, 383, in which
it was declared:

"Of course, this power of reviewing and setting aside the
action of the local land officers is, as was decided in *Cornelius*
v. *Kessel,* 128 U. S. 456, not arbitrary and unlimited. It
does not prevent judicial inquiry. *Johnson* v. *Towsley,* 13
Wall. 72. The party who makes proofs, which are accepted
by the local land officers, and pays his money for the land, has

acquired an interest of which he cannot be arbitrarily dispossessed."

Whenever, in pursuance of the legislation of Congress, rights have become vested it becomes the duty of the courts to see that those rights are not disturbed by any action of an executive officer, even the Secretary of the Interior, the head of a department. However laudable may be the motives of the Secretary, he, as all others, is bound by the provisions of Congressional legislation. It must be borne in mind that this allotment provided by Congress contemplated a distribution among the Choctaw and Chickasaw Indians of the lands that belonged to them in common. They were the principal beneficiaries, and their titles to the lands they selected should be protected against the efforts of outsiders to secure them. White men settling on townsites were not the principal beneficiaries. Congress, it is true, authorized townsites, and the town of Mill Creek was established in compliance with the statute. It further provided for an enlargement of any townsite upon the recommendation of the Commission to the Five Civilized Tribes. That recommendation was made in respect to the town of Mill Creek, but disapproved by the Secretary of the Interior. Thereafter the relator selected the land in controversy, a tract of forty acres, on which were her improvements. Notice was given as required, and the time in which contest could be made—nine months—elapsed. Thereupon, as provided by the statute, the title of the allottee to the land selected became fixed and absolute, and the chief authorities of the Choctaw and Chickasaw Nations executed to her a patent, as required, of the land selected. The fact that there may have been persons on the land is immaterial. They were given nine months to contest the right of the applicant. They failed to make contest, and her rights became fixed. Thereafter the Secretary of the Interior had nothing but the ministerial duty of seeing that a patent was duly executed and delivered.

That the performance of a ministerial duty can be com-

pelled by mandamus has been often adjudged. As said by Mr. Justice Peckham, in *Roberts* v. *United States*, 176 U. S. 221, 229:

"The law relating to mandamus against a public officer is well settled in the abstract, the only doubt which arises being whether the facts regarding any particular case bring it within the law which permits the writ to issue where a mere ministerial duty is imposed upon an executive officer, which duty he is bound to perform without any further question. If he refuse under such circumstances, mandamus will lie to compel him to perform his duty."

See also *Noble* v. *Union River Logging Co.*, 147 U. S. 165, in which Mr. Justice Brown cites many cases and draws distinctions between them.

But the authorities come more closely to the facts in this case. In *Barney* v. *Dolph*, 97 U. S. 652, 656, Mr. Chief Justice Waite said:

"The execution and delivery of the patent after the right to it is complete are the mere ministerial acts of the officer charged with that duty."

In *Simmons* v. *Wagner*, 101 U. S. 260, 261, the same Chief Justice repeated the proposition in these words:

"Where the right to a patent has once become vested in a purchaser of public lands, it is equivalent, so far as the government is concerned, to a patent actually issued. The execution and delivery of the patent after the right to it has become complete are the mere ministerial acts of the officers charged with that duty. *Barney* v. *Dolph*, 97 U. S. 652; *Stark* v. *Starrs*, 6 Wall. 402."

In *United States* v. *Schurz*, 102 U. S. 378, 403, Mr. Justice Miller, delivering the opinion of the court, said:

"No further authority to consider the patentee's case remains in the land-office. No right to consider whether he ought in equity, or on new information, to have the title or receive the patent. There remains the duty, simply ministerial, to deliver the patent to the owner,—a duty which,

within all the definitions, can be enforced by the writ of man-damus."

We think the judgment of the Court of Appeals of the District of Columbia, affirming the judgment of the Supreme Court of the District, was right, and it is

*Affirmed.*