**UNITED STATES ex rel. KRUSHNIC v. WEST, Secretary of the Interior.**

Court of Appeals of District of Columbia.

Argued December 5, 1928.   Decided January 7, 1929.

No. 4823.

C. I. Long and P. Q. Nyce, both of Washington, D. C., and Charles S. Thomas and Langdon H. Larwill, both of Denver, Colo., for appellant.

O. H. Graves, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. Appellant, hereafter referred to as plaintiff, filed his petition for a writ of mandamus against the Secretary of the Interior to compel the issuance to him of a patent to certain oil shale mining land in Garfield county, Colorado. On the response to the rule to show cause, the court, on hearing, discharged the rule and dismissed the petition.

From the facts set forth in the petition, and admitted by the response to the rule, it appears that plaintiff and seven associates, on October 1, 1919, located, together with a number of other claims, the mining claim here in question, known as Spad No. 3, placer claim, which was at that time subject to appropriation under the mining laws of the United States. An attempt was made by plaintiff and his associates to perform the actual labor required on the claim for the year 1920. The labor performed was on contiguous claims, and not on the claim in question, which led to a dispute as to the sufficiency of the performance of the assessment work for the year 1920. Thereafter plaintiff acquired the interest of his colocators and performed

the labor required for the assessment year 1921, and continued to perform annual labor until the improvements on the claim were of a value of more than $500, when he applied for a patent on December 16, 1922.

It further appears that at no time after the date of the original location of the claim was any attempt at relocation thereof made by any other person, and no contest has been instituted by any one to question plaintiff's ownership of the claim. However, after the application for patent was made, contest proceedings were instituted by officers of the Department of the Interior. On hearing, all the charges made by the government against the claim were either withdrawn or dismissed by the register, except the charge as to the insufficiency of the annual labor for the assessment year 1920. On this ground alone the Commissioner of the General Land Office held the claim to be null and void, and this holding was approved by the Secretary of the Interior.

Plaintiff then filed his petition in the Supreme Court of the District of Columbia for a writ of mandamus, and from the order of the court dismissing the petition this appeal was taken.

It is conceded by counsel for the Secretary that, but for the intervention of the Leasing Act of February 25, 1920, 41 Stat. 437, during the time when this claim was subject to relocation, plaintiff, under the mining law in force prior to the passage of the Leasing Act, would be entitled to his patent. The pertinent provisions of the Mining Law applicable to this case are found in sections 2324 and 2325, Rev. Stats. U. S. (30 USCA §§ 28, 29). Section 2324 provides in part as follows:

"On each claim located after the tenth day of May, eighteen hundred and seventy-two, and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year. * * * And upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location."

Section 2325 provides the procedure for obtaining a patent, and, among other things, "that five hundred dollars' worth of labor has been expended or improvements made upon the claim by himself or grantors."

We come now to consider the effect on plaintiff's rights by reason of the intervention of the Leasing Act during the period, 1920, when, it is asserted, the claim was subject to relocation under the Mining Law. Section 37 of the act (30 USCA § 193) provides as follows:

"That the deposits of coal, phosphate, sodium, oil, oil shale, and gas, herein referred to, in lands valuable for such minerals, including lands and deposits described in the joint resolution entitled 'Joint Resolution Authorizing the Secretary of the Interior to Permit the Continuation of Coal-Mining Operations on Certain Lands in Wyoming,' approved August 1, 1912 (Thirty-seventh Statutes at Large, page 1346), shall be subject to disposition only in the form and manner provided in this act, except as to valid claims existent at date of the passage of this act and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery."

The Secretary of the Interior, in his opinion refusing to issue plaintiff a patent, recognized the well-established principle under the Mining Law of 1872, to the effect that a failure to perform the assessment work as provided in the act subjected the claim to relocation, and, if it is so located before the original claimant resumes work, his rights are lost. But if no relocation is made, and the original claimant resumes work, his rights stand the same as if there had been no failure to comply with the conditions of the act subjecting the claim to relocation.

In his opinion, however, as to the effect of section 37 of the Leasing Act, he said:

"There is no doubt that the doctrine above quoted continues to be the law as to mineral lands that continue to be subject to location and purchase under the general mining law, but it is not the law as to mineral lands affected by the Leasing Act. Section 37 thereof at one blow destroyed the right of relocation of such minerals, and with it fell the right of resumption. It is contrary to the declared purpose and object of the act to assume that, in doing away with the system of a free grant of the minerals and the grant of a fee title, it was intended to preserve all the rights of a mining locator and at the same time relieve him of his duties, for that is the consequence if neither the government nor an individual can now take advantage of his default. The fair and obvious meaning of section 37 is that, if the annual work is not done, all the rights of the claimant are gone."

We think that the Secretary is in error in his construction of the Leasing Act. In

section 37 of the act, supra, Congress excepted from the provisions of the act valid claims existing at the date of its passage "and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery." It will be observed that this provision merely circumscribes the operation of the Mining Act in respect of certain mineral deposits lying within the public domain and subject to discovery and location under that act. By the Leasing Act these mineral deposits, including oil shale, are withdrawn from private acquisition, except as to valid existing claims at the date of the passage of the Leasing Act. There is no apparent intention on the part of Congress, by the provisions of the Leasing Act, to include within its terms claims initiated under the Mining Law, and which had a valid existence at the date of its passage. Inasmuch as it is conceded in this case that, but for the passage of the Leasing Act, plaintiff's claim is valid and entitles him to a patent, it must be conceded that its validity, in the absence of any intervening relocator, continued at all times from the date of location until the filing of his application for a patent. We interpret the exception to mean that so long as a person, who located a claim prior to the passage of the Leasing Act, maintains and observes the requirements of the Mining Act, and on complete compliance therewith applies for his patent, he comes within the exception to the Leasing Act and is not barred thereby. Such a locator is not subjected to any forfeitures that did not apply to the Mining Act, and the mere fact that oil shale claims were no longer subject to relocation after the passage of the Leasing Act is of no importance. Until relocation intervened, the claim of the original locator, or his lawful successor in interest, remained unimpaired. His rights after resumption were restored to exactly the same standing that they had, if no default had been made.

The statutory requirement of the Mining Law of annual expenditure upon an unpatented mining claim never was considered, either by the courts or the government, as a matter of concern to the Interior Department. Section 53 of the Department Regulations, adopted after the passage of the Mining Act, declares that "the annual expenditure of $100 in labor or improvements on a mining claim, required by section 2324 of the Revised Statutes, is solely a matter between rival or adverse claimants to the same mineral land and goes only to the right of possession, the determination of which is committed exclusively to the courts."

This rule has been followed in the courts generally, and in the federal courts it has been held that mere failure to perform the required annual labor does not, in the absence of the intervention of a relocator, work a forfeiture. In Bingham Amalgamated Copper Co. v. Ute Copper Co. (C. C.) 181 F. 748, the court said:

"The contention is also made that, because the plaintiff failed to affirmatively show the performance of assessment work for its claim for the year 1906, it must be denied relief. A failure to perform the required annual labor does not in and of itself work a forfeiture. It only permits a relocation. As the Abraham claim was located February 25, 1906, it cannot be considered a relocation of the plaintiff's claims, based on the failure to perform the annual labor for 1908." To the same effect are North Noonday Mining Co. v. Orient Mining Co. (C. C.) 1 F. 522; Thatcher v. Brown (C. C. A.) 190 F. 708.

Belk v. Meagher, 104 U. S. 279, 26 L. Ed. 735, was a suit in ejectment between an original locator of a mining claim and a relocator. In that case the rule is clearly announced that mere failure to do assessment work does not terminate the locator's right of possession, until there has been an interruption by the intervention of a relocator. On this point the court said:

"It seems to us clear that, if work is renewed on a claim after it has once been open to relocation, but before a relocation is actually made, the rights of the original owners stand as they would if there had been no failure to comply with this condition of the act. The argument on the part of the plaintiff in error is that, if no work is done before January, 1875, all rights under the original claim are gone; but that is not, in our opinion, the fair meaning of the language which Congress has employed to express its will. As we think, the exclusive possessory rights of the original locator and his assigns were continued, without any work at all, until January 1, 1875, and afterwards if, before another entered on his possession and relocated the claim, he resumed work to the extent required by the law. His rights after resumption were precisely what they would have been if no default had occurred."

In Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313, it was held that, while the title to mineral lands remains in the United States until a patent issues therefor, the ores dug and detached from the lands under a mining claim are free from any lien, claim, or title of the United States. They are the personal property of the miner, and as such subject to

state taxation. It was also held that a mining claim is property in the fullest sense of the word, and that the claim of the locator is subject to a lien for state taxes and may be sold for the nonpayment of them without infringing in any respect the paramount title of the United States in the land. This, it will be observed, is clear authority for the proposition that the government has no responsibility or interest in the contests between rival claimants, or in the ore when detached from the land.

The rule that mere failure to perform annual assessment work does not constitute in itself a forfeiture has been upheld by the courts of the mining states of the West. In Field v. Tanner, 32 Colo. 278, 75 P. 916, the Supreme Court of Colorado said:

"It will be observed that failure to do the annual assessment work does not, ipso facto, work a forfeiture of a load mining claim, but the same merely becomes liable to forfeiture, which may be complete and final when the rights of third persons accrue. If, however, before such rights do attach, the original locator resumes work, the forfeiture is avoided. McGinnis et al. v. Egbert, 8 Colo. 41 [5 P. 652]; Belk v. Meagher, 104 U. S. 279 [26 L. Ed. 735]." To the same effect are Lacey v. Woodward, 5 N. M. 583, 25 P. 785; Emerson et al. v. McWhirter et al., 133 Cal. 1036, 65 P. 510; Madison et al. v. Octave Oil Co., 154 Cal. 768, 99 P. 176; Florence-Rae Copper Co. v. Kimbel, 85 Wash. 162, 147 P. 881.

It would require a stretch of the imagination to hold that under this existing policy it was intended by Congress that the government, through its Secretary of the Interior, might assume the functions of a relocator and enforce the forfeiture of the locator and dispossess him of his claim. The Secretary, however, bases his opinion upon the recent case of Hodgson v. Midwest Oil Co. (C. C. A.) 17 F.(2d) 71. That case, we think, has little if any bearing upon the question here in issue. It turned largely upon a question of pleading. It appears that the original locator located the oil claim in question in Carbon county, Wyoming, in 1887, and alleged in his petition for ejectment that he had been in open, notorious, continuous, exclusive, and adverse possession of the claim from the date of discovery, May 2, 1887, down to April 22, 1921, and that more than $500 worth of labor had been expended in improvements thereon prior to September 27, 1909, when by an executive order of the President of the United States all vacant and unappropriated public lands and petroleum deposits in the public domain were withdrawn from location and entry under the mineral public land laws. He further alleged that on May 10, 1910, William C. Henshaw and seven others secretly, fraudulently, clandestinely, and unlawfully, entered upon said mining claim and made a location thereof; and that on August 19, 1920, the defendants filed an application for an oil and gas lease on the said land which was thereafter granted, and that on or about April 22, 1921, the defendants wrongfully and unlawfully entered into the actual, exclusive, and adverse possession of said lands, ousting plaintiff's predecessors therefrom, and have since wrongfully and unlawfully held possession of the same.

The question of pleading on which the case turned was the sufficiency of the averment that plaintiff was ousted from possession by the defendants in 1921. The court, after quoting from Lindley On Mines (3d Ed.) § 634, to the effect that a locator cannot be deprived of his inchoate rights by the tortious acts of others, said:

"Now in the instant case there is no plea of any threat of violence or physical opposition whatever. There is no allegation in the petition that the plaintiff or his predecessors, or any of them, ever offered or attempted to do assessment work during the period named [the year 1921]. The formal plea of entry and actual, exclusive and adverse possession of a quarter section of land constituting a placer mining claim located after discovery, would not seem to be equivalent to an allegation of such hostile acts and declarations as to satisfy a man of ordinary prudence that it would be unsafe to begin work."

The court accordingly held that in the absence of any showing of assessment work done for the year 1921 all possessory rights of the plaintiff terminated. In reaching this conclusion, the court said:

"It is clear that such original locator and his assigns [were] required as a condition subsequent to do the so-called 'assessment work' periodically, and, upon failure so to do during any interval fixed by law, all possessory rights terminated. Ordinarily, and in the absence of any withdrawal, the locator would have the right to relocate, equally only, however, to any other person qualified to locate. * * * It is well settled that a failure to do the work or have an adequate legal excuse automatically terminates the locator's right of possession."

These declarations seem to be in conflict with the settled mining law of more than 50 years. We are unable to find an authority,

either judicial or departmental or of a text-writer, where it has been held that a relocation of the claim is essential before resumption of work by a delinquent locator. "Resumption of work at any time prior to the lawful inception of an intervening right prevents forfeiture. It does not restore a lost estate." 2 Lindley, Mines (2d Ed.) § 851. Quoted with approval in Knutson v. Fredlund, 56 Wash. 634, 106 P. 202. The locator neither loses his title in his claim nor automatically terminates his right of possession by mere failure to do his assessment work within the statutory period. These rights can only be affected by the relocation of the claim by an adverse party.

It will also be observed that the opinion was not grounded upon the effect of the intervention of the Leasing Act, further than to hold that by the failure of the plaintiff to perform his assessment work in the year 1921 his rights were lost, and the claim became subject to disposition under the existing law which at that date was the Leasing Act. It involved no construction of the Leasing Act to the effect that the Secretary of the Interior may assume the status of a relocator or that the exception in the Leasing Act applied to a case of this sort. The fundamental error in the opinion, as we have pointed out, was in holding that failure to do assessment work automatically terminates a locator's rights. It was this misinterpretation of the law which led the department into error.

We construe the exception in the Leasing Act as intended to preserve all the rights of the locator of an existing claim at the time of its passage. It is urged, however, by counsel for the Secretary that if the Leasing Act only prohibits the relocation by the third party of an existing mining claim, the original locator may defer his assessment work indefinitely, or at least so long as he may evade the charge of abandonment. It is difficult to conceive just how the disqualification of the relocator can affect rights accorded the locator by the statute. The locator, by virtue of his location and development of the mine, acquires a valuable property right that may never develop into a patent.

In the Forbes Case these claims are described as "property in the miner, and property of great value. * * * They are property in the fullest sense of the word, and their ownership, transfer, and use are governed by a well-defined code or codes of law, and are recognized by the states and the federal government. This claim may be sold, transferred, mortgaged, and inherited, without infringing the title of the United States."

Neither is this a matter of serious concern to the government, since these rights were conferred in aid of a policy to insure the development of the mining industry. No intention was displayed by Congress of returning any revenues to the government from the minerals extracted either before or after patent of the lands. The only possible benefit that accrued to the United States was through the sale of the land for a nominal consideration. It, therefore, was a matter of little concern where the paramount title to the land remained. In either instance, the government was neither a gainer nor a loser. Indeed by the failure of the locator to purchase, the government retained title in the land and stood to be a gainer through failure of the locator to protect his rights.

A part of the property right vested in the locator was to resume delinquent assessment work without penalty for his delinquency, and until this right had been foreclosed by the relocation of the mine by a third party it remained a valuable incident of the grant. It logically follows that if Congress in the Leasing Act had intended to deprive a prior locator of this valuable privilege, it would have given expression to that intent in clear and unmistakable language. Not only is the act silent in this particular, but there is nothing in the language of the exception on which to hang such a judicial inference. It clearly excepts existing claims that continue to be *maintained* in conformity with the mining law under which the locator's right had its inception. There is clearly no intent manifested of subjecting this valuable privilege to confiscation by operation of departmental law.

We come now to the usual objection presented by the department, namely, the jurisdiction of the court to compel the Secretary, by writ of mandamus, to issue a patent. In this case the court is not invading the exclusive jurisdiction of the Secretary to determine discretionary questions of fact, nor his interpretation of the meaning of a law upon which the exercise of his discretion depends. In the present case, with the facts conceded, nothing remains to be done by the Secretary but the performance of the mere ministerial act of issuing a patent; and if, as in the present case, the Secretary misinterprets his statutory duties in conformity with the facts, it is well within the power of the court to place its interpretation upon the law and direct the Secretary to act in accordance therewith. Perhaps the power of the court, in cases of this character, to control the acts of an executive officer by mandamus, is best

expressed in Roberts v. United States, 176 U. S. 221, 20 S. Ct. 376, 44 L. Ed. 443, where the court, speaking through Mr. Justice Peckham, said:

"Unless the writ of mandamus is to become practically valueless, and is to be refused, even where a public officer is commanded to do a particular act by virtue of a particular statute, this writ should be granted. Every statute to some extent requires construction by the public officer whose duties may be defined therein. Such officer must read the law, and he must therefore, in a certain sense, construe it, in order to form a judgment from its language what duty he is directed by the statute to perform. But that does not necessarily and in all cases make the duty of the officer anything other than a purely ministerial one. If the law direct him to perform an act in regard to which no discretion is committed to him, and which, upon the facts existing, he is bound to perform, then that act is ministerial, although depending upon a statute which requires, in some degree, a construction of its language by the officer. Unless this be so, the value of this writ is very greatly impaired. Every executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him, and therefore it was not ministerial, and the court would on that account be powerless to give relief. Such a limitation of the powers of the court, we think, would be most unfortunate, as it would relieve from judicial supervision all executive officers in the performance of their duties, whenever they should plead that the duty required of them arose upon the construction of a statute, no matter how plain its language, nor how plainly they violated their duty in refusing to perform the act required."

Coming to the more concrete application of the foregoing rule to the present case, the court, in Ballinger v. United States ex rel. Frost, 216 U. S. 240, 30 S. Ct. 338, 54 L. Ed. 464, sustaining an application for a writ of mandamus to compel the Secretary of the Interior to deliver a patent to certain Indian lands, quoted from leading decisions as follows:

"The execution and delivery of the patent after the right to it is complete are the mere ministerial acts of the officer charged with that duty." Barney v. Dolph, 97 U. S. 652, 656, 24 L. Ed. 1063.

"Where the right to a patent has once become vested in a purchaser of public lands, it is equivalent, so far as the government is concerned, to a patent actually issued. The execution and delivery of the patent after the right to it has become complete are the mere ministerial acts of the officers charged with that duty." Simmons v. Wagner, 101 U. S. 260, 261, 25 L. Ed. 910.

"No further authority to consider the patentee's case remains in the land office. No right to consider whether he ought in equity, or on new information, to have the title or receive the patent. There remains the duty, simply ministerial, to deliver the patent to the owner, a duty which, within all the definitions, can be enforced by the writ of mandamus." United States v. Schurz, 102 U. S. 378, 403, 26 L. Ed. 167. To the same effect are Lane v. Hoglund, 244 U. S. 174, 37 S. Ct. 558, 61 L. Ed. 1066; Work v. United States ex rel. McAlester-Edwards Company, 262 U. S. 200, 43 S. Ct. 580, 67 L. Ed. 949.

In the present case it is conceded that but for the intervention of the Leasing Act appellant would be entitled, under the law, to his patent. In this situation, clearly nothing remains for the Secretary, but to comply with the law and issue the patent; and this may be compelled by a writ of mandamus. "The rule applicable in such a situation is that 'a person who complies with all the requisites necessary to entitle him to a patent for a particular lot or tract is to be regarded as the equitable owner thereof.'" Payne v. Central Pacific Railway Co., 255 U. S. 228, 237, 41 S. Ct. 314, 316 (65 L. Ed. 598).

The judgment is reversed with costs, and the cause is remanded for further proceedings not inconsistent with this opinion.