(Slip Opinion)

# Whether a Bankruptcy Judge's Appointment of a Special Master Would Violate Article III of the Constitution

A bankruptcy court's unilateral subdelegation of functions requiring an Article III judge's "total control" violates Article III of the Constitution.

Proposed amendments to the Federal Rules of Bankruptcy Procedure authorizing bankruptcy judges to appoint special masters to perform functions involving constitutionally non-core claims would deprive Article III courts of the requisite "total control."

March 17, 2026

MEMORANDUM OPINION FOR THE ACTING DIRECTOR
EXECUTIVE OFFICE FOR UNITED STATES TRUSTEES

The Advisory Committee on Bankruptcy Rules is considering proposals to amend Federal Rule of Bankruptcy Procedure 9031 to allow bankruptcy judges to appoint special masters, in a manner similar to federal district courts' appointment of special masters under Federal Rule of Civil Procedure 53. *See* Memorandum for Advisory Committee on Bankruptcy Rules, from Subcommittee on Business Issues, *Re: Suggestions for Amending Rule 9031 (Using Masters Not Authorized)* (Aug. 29, 2025), https://perma.cc/86QX-QZA6 ("Advisory Committee Memo"). One proposal has been submitted by Chief Bankruptcy Judge Michael B. Kaplan of the District of New Jersey ("Kaplan Proposal"), and one has been submitted by the American Bar Association ("ABA Proposal"). The Subcommittee on Business Issues has also prepared a discussion draft of a proposed rule ("Subcommittee Proposal") for consideration by the Advisory Committee.

You have asked us whether enacting one of the proposals, and thus allowing bankruptcy judges to appoint special masters, could violate Article III of the U.S. Constitution. More generally, you have asked what limits Article III imposes on bankruptcy judges' appointments of special masters.[1] We conclude that the proposals as drafted raise serious constitu-

---

[1] We were not asked to, and therefore do not, opine on whether the Bankruptcy Code confers statutory authority for bankruptcy judges to appoint or pay special masters. We note that the Advisory Committee has previously voted against proposals to amend Federal Rule of Bankruptcy Procedure 9031, in part because the Advisory Committee believed that there may not be statutory authority under the Bankruptcy Code to appoint special masters.

tional concerns about the proper division of authority between Article I and Article III courts. It would violate Article III for a bankruptcy court to unilaterally appoint a special master to exercise functions that require the "total control" of an Article III judge—that is, functions involving constitutionally non-core claims. *See United States v. Raddatz*, 447 U.S. 667, 681 (1980); *Stern v. Marshall*, 564 U.S. 462, 484 (2011). A bankruptcy judge's unilateral appointment of a special master would bypass the constitutional prerogative of the Article III judge to choose whether to subdelegate certain functions related to non-core claims, and the proposed amendments do not account for this Article III prerogative. The maxim that a delegated power cannot be further delegated without express authorization from the principal further supports our conclusion.

Part I surveys the constitutional and statutory distinction between Article I's bankruptcy power and Article III's judicial power. Part II addresses the limits on an Article III court's authority to delegate functions to non-Article III adjuncts. Part III applies these principles to the Kaplan, ABA, and Subcommittee Proposals.

# I.

The distinction between the judicial power and bankruptcy is foundational to our analysis. "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. That judicial power—the power to "render dispositive judgments," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995)—can be exercised only by "judges who have life tenure and protection from decreases in salary," *Thomas v. Arn*, 474 U.S. 140, 153 (1985). Neither Congress nor Article III judges can assign or delegate that power outside Article III. "When a suit is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789, and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Stern*, 564 U.S. at 484 (citation omitted).

Bankruptcy is different. Adjusting the relationship between debtors and creditors through bankruptcy was not historically understood to be part of the judicial power. As Blackstone explained, bankruptcy is an "extrajudicial method of proceeding, which is allowed merely for the benefit

of commerce." 2 William Blackstone, *Commentaries* \*477. Thus, "[b]ankruptcy law was never part of the common law. The courts of law and equity became involved only to the extent necessary to interpret the statutes." Thomas E. Plank, *Why Bankruptcy Judges Need Not and Should Not Be Article III Judges*, 72 Am. Bankr. L.J. 567, 574 (1998). In fact, "[b]ankruptcy law in England was the creation of Parliament, not the common law." *Id.* at 575. The Constitution thus vested Congress with power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8. Bankruptcy judges therefore perform a special and distinct duty within our constitutional system.

Before 1978, Congress distinguished between claims involving property in the possession of the bankruptcy court that fell within that court's "summary jurisdiction," and claims to augment the bankruptcy estate that fell within the district court's "plenary jurisdiction." *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 31–32 (2014). Upon referral by the court of bankruptcy (typically an Article III court), bankruptcy "referees" could exercise jurisdiction over summary matters of estate and case administration, but proceedings implicating plenary jurisdiction "were not referred to the bankruptcy courts absent both parties' consent." *Id.* at 31. That distinction between summary and plenary jurisdiction reflected the historic separation between Article I's bankruptcy power and Article III's judicial power. *See* Ralph Brubaker, *Non-Article III Adjudication: Bankruptcy and Nonbankruptcy, With and Without Litigant Consent*, 33 Emory Bankr. Devs. J. 11, 55–57 (2016).

Congress briefly abandoned that distinction under the Bankruptcy Reform Act of 1978 ("1978 Act"), which extended to bankruptcy judges jurisdiction over "all civil proceedings arising under title 11 or arising in or related to cases under title 11." Pub. L. No. 95-598, § 241(a), 92 Stat. 2549, 2668 (codified as amended at 28 U.S.C. § 1334(a)). Bankruptcy judges were thereby "vested with all of the 'powers of a court of equity, law, and admiralty,'" with only limited exceptions. *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 55 (1982) (plurality opinion) (quoting 1978 Act § 241(a), 92 Stat. at 2671). In *Northern Pipeline*, the Supreme Court determined that the 1978 Act violated Article III insofar as it allowed bankruptcy courts to exercise the judicial power. *Id.* at 87; *see also id.* at 91 (Rehnquist, J., concurring in the judgment). In other

words, *Northern Pipeline* held it "unconstitutional for Congress to give non-Article III bankruptcy judges final-judgment adjudicatory authority in a traditional plenary suit against an adverse claimant." Brubaker, 33 Emory Bankr. Devs. J. at 49.

Two years after *Northern Pipeline*, Congress essentially restored the summary-versus-plenary jurisdiction distinction in different terms—respectively as "core" and "non-core" bankruptcy matters. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984 ("1984 Act"), Pub. L. No. 98-353, § 104(a), 98 Stat. 333, 340–41 (codified as amended at 28 U.S.C. § 157). Congress vested all bankruptcy jurisdiction in the district courts and then allowed the district courts to refer bankruptcy cases and related proceedings to bankruptcy courts for adjudication. *See* 28 U.S.C. §§ 157(a), 1334(a)–(b).

When the Supreme Court analyzed the "core" versus "non-core" statutory distinction in *Granfinanciera, S.A. v. Nordberg*, it concluded Congress could not eliminate a party's Seventh Amendment jury-trial right by attaching the "core" label to a common-law cause of action and vesting exclusive jurisdiction in the bankruptcy court. 492 U.S. 33, 60–61 (1989).[2] Later, in *Stern v. Marshall*, the Court determined that some statutorily designated "core" claims exceeded the boundaries of Article I and required the exercise of judicial power by an Article III court for resolution. 564 U.S. at 482–86. In doing so, the Court continued to enforce (as a constitutional matter) the delineation between (1) historically summary matters subject to non-Article III adjudication, and (2) plenary suits at law or in equity that require Article III judicial power.

Today, the statutory core versus non-core distinction does not neatly track the line between Article I and Article III powers. Although most statutorily core claims may be decided by bankruptcy judges, there remains a category of "*Stern* claims" that are statutorily "core" that cannot "proceed[] in that way as a constitutional matter." *Arkison*, 573 U.S. at 29–31 & n.2. When presented with *Stern* claims, a bankruptcy court must treat them as statutorily non-core claims and "issue proposed findings of fact and conclusions of law" that "[t]he district court will then review . . .

---

[2] The Supreme Court has "distinguished between cases involving so-called 'public rights,' which may be removed from the jurisdiction of Article III courts, and cases involving 'private rights,' which may not." *Arkison*, 573 U.S. at 32; *see also Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018).

*de novo* and enter judgment." *Id.* at 31. In the rest of this opinion, we use the core versus non-core distinction in the constitutional sense (which appears to track the historic summary-versus-plenary distinction), rather than strictly following the Bankruptcy Code's definitions of those claims.

## II.

The constitutional core versus non-core distinction matters for the proposed subdelegation of certain functions from bankruptcy judges to special masters. Under the 1984 Act, Article III courts maintain original jurisdiction over bankruptcy and related proceedings. *See* 28 U.S.C. § 1334(a)–(b). Article III judges must decide whether to refer cases to bankruptcy judges, and that referral is subject to withdrawal. *See id.* § 157(a), (d). In the absence of the parties' consent, only an Article III judge may enter final judgment on a non-core claim. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 673–74 (2015); *see also id.* at 686 (Alito, J., concurring in part and in the judgment) (comparing a bankruptcy judge's adjudication of non-core claims subject to the parties' consent in an adversarial proceeding to "an ordinary, run-of-the-mill arbitration").

Repeatedly, the Supreme Court has corrected unchecked delegations of judicial power to non-Article III adjuncts—such as magistrate judges, bankruptcy judges, and special masters. An Article III court's delegation of judicial functions to a non-Article III adjunct is permissible only if "the entire process takes place under the district court's total control and jurisdiction" and the Article III judge "exercises the ultimate authority to issue an appropriate order." *Raddatz*, 447 U.S. at 681–82 (cleaned up). The Supreme Court has found that there is "sufficient control" by an Article III court when the adjunct is "appointed, and subject to removal, by the district court," and when all of the adjunct's "proposed findings and recommendations [are] subject to *de novo* review by the district court." *Northern Pipeline*, 458 U.S. at 78–79 (plurality opinion). Where those protections are in place, the Court has been satisfied that "the ultimate decisionmaking authority respecting all pretrial motions clearly remain[s] with the district court." *Id.* at 79.

The Supreme Court's "total control" test is reinforced by the legal maxim *delegata potestas non potest delegari* (a delegated power cannot be further delegated). That maxim of agency law "is well understood and has had wider application in the construction of our Federal and State Consti-

tutions than it has in private law." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 405–06 (1928); *see also Disposition of Shipping Board Vessels*, 33 Op. Att'y Gen. 570, 580 (1923) ("It is a well-settled rule that a public officer or public body can not delegate powers which require the exercise of judgment and discretion."); *Supervising Inspectors of Steam Vessels—Delegation of Authority*, 25 Op. Att'y Gen. 56, 58 (1903) ("But the authority to make regulations . . . involving as it does the exercise of judgment and discretion, cannot, under a well-settled principle, be delegated.").[3]

Subdelegations of ministerial functions are generally an exception to the maxim. *See Hitchcock v. Galveston*, 96 U.S. 341, 348 (1878) (allowing the subdelegation of "ministerial work [to] agents"); 1 *Sutherland*

---

[3] *See also* Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 567, at 368 (1890) ("This rule applies also to public officers. In those cases in which the proper execution of the office requires, on the part of the officer, the exercise of judgment or discretion, the presumption is that he was chosen because he was deemed fit and competent to exercise that judgment and discretion, and, unless power to substitute another in his place has been given to him, he can not delegate his duties to another."); Joseph Story, *Commentaries on the Law of Agency, as a Branch of Commercial and Maritime Jurisprudence* 14 (2d ed. 1844) ("[O]ne, who has a bare power or authority from another to do an act, must execute it himself, and cannot delegate his authority to another; for this being a trust or confidence reposed in him personally, it cannot be assigned to a stranger, whose ability and integrity might not be known to the principal, or who, if known, might not be selected by him for such a purpose."); 2 James Kent, *Commentaries on American Law* 495 (1827) ("An agent, ordinarily, and without express authority, has not power to employ a sub-agent to do the business, without the knowledge or consent of his principal. The maxim is, that *delegatus non potest delegare*, and the agency is generally a personal trust and confidence which cannot be delegated."); Dig. 1.21.5 (Paulus, Ad Plautium 18), *in* 2 *The Civil Law* 263 (S.P. Scott ed. & trans., 1932) ("It is evident that anyone to whom jurisdiction has been delegated cannot delegate the same to another."); Restatement (Third) of Agency § 3.15 (2006) ("An agent may appoint a subagent only if the agent has actual or apparent authority to do so.").

This maxim rarely operates within the Executive Branch, however, because Congress generously confers both express and implied authority to subdelegate functions. *See, e.g.*, *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 120–21 (1947). Congress's promiscuous granting of subdelegation authority to the Executive Branch gives rise to a presumption favoring its existence in that context. *See, e.g.*, *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004). But on occasion a specific statute prohibiting subdelegation may trump a general statute allowing it, *see United States v. Giordano*, 416 U.S. 505, 513 (1974), or a statutory list of subdelegable functions may operate to exclude those not listed, *see Cudahy Packing Co. of La. v. Holland*, 315 U.S. 357, 366 (1942).

*Statutory Construction* § 4:14 (7th ed. 2025) ("Ministerial or administrative functions may be subdelegated, for the ordinary board or commission can not personally perform the multitude of clerical, physical and nondiscretionary acts required of the usual administrative agency."). A ministerial duty is "one in respect to which nothing is left to discretion." *Gaines v. Thompson*, 74 U.S. (7 Wall.) 347, 353 (1869); *see also, e.g.*, *Houston v. Ormes*, 252 U.S. 469, 472 (1920) (once an appropriation is made by Congress, paying the designated recipient is a "ministerial duty"); *Ballinger v. United States ex rel. Frost*, 216 U.S. 240, 250 (1910) (once a patent is vested, its "execution and delivery" are "ministerial acts").

Assuming the Supreme Court's "total control" test likewise admits a ministerial-duty exception, ministerial duties in bankruptcy are few. After all, courts of appeal have considered fact-finding to be a judicial, not a ministerial, function. *See, e.g.*, *In re Pratt*, 524 F.3d 580, 584 (5th Cir. 2008); *In re Prosser*, 777 F.3d 154, 160–61 n.8 (3d Cir. 2015); *In re Roussel*, 769 F.3d 574, 577 (8th Cir. 2014); *In re Marino*, 949 F.3d 483, 488 (9th Cir. 2020). And determinations of whether other functions are discretionary or ministerial would also likely require case-by-case examination. *Cf. United States ex rel. Kerr v. Ross*, 5 App. D.C. 241, 254–55 (D.C. Cir. 1895) (considering the specific powers that purportedly had been delegated before holding that a "discretionary power" had been delegated).

When exercising functions related to non-core matters, bankruptcy judges, magistrates, and special masters operate on the same field. *See Raddatz*, 447 U.S. at 683 n.11 ("[T]he role of the master is, for these purposes, analogous to that of a magistrate."). Outside the specific functions that magistrates may exercise, Congress authorizes magistrates themselves to serve as special masters. *See* 28 U.S.C. § 636(b)(2). And when a district court refers to the bankruptcy court a non-core matter, the bankruptcy judge effectively acts as a magistrate or special master. *See Wellness Int'l*, 575 U.S. at 679 (comparing bankruptcy judges and magistrates).

In each of these scenarios, the district court has "plenary discretion whether to authorize" a magistrate, special master, or bankruptcy judge to perform certain functions. *Raddatz*, 447 U.S. at 681; *see also Mathews v. Weber*, 423 U.S. 261, 270 (1976) ("The [Federal Magistrates] Act's sponsors made it clear that the magistrate acts 'under the supervision of

the district judges' when he accepts a referral, and that authority for making final decisions remains at all times with the district judge." (quoting S. Rep. No. 90-371, at 12 (1967)); *In re Jud. Misconduct*, 752 F.3d 1204, 1205 (9th Cir. 2014) ("The key is that the subordinate is acting pursuant to instructions from, and under the supervision of, the judge, and that the judge exercises authority over the substantive disposition of the matters presented to him."). And in each of these scenarios, the magistrate, special master, or bankruptcy judge is a delegee; he hears matters "solely on a district court's reference, which the district court may withdraw *sua sponte* or at the request of a party." *Wellness International*, 575 U.S. at 679 (citations omitted). Article III requires that district courts maintain "total control" over their delegees.[4]

## III.

Each of the proposed amendments to Bankruptcy Rule 9031 that have been submitted to the Advisory Committee appears to violate the Supreme Court's "total control" test for matters involving non-core claims. *See* Advisory Committee Memo at 2–5.[5] Setting aside circumstances involv-

---

[4] We are aware of a non-precedential Third Circuit decision affirming a magistrate judge's appointment of a special master to supervise non-dispositive discovery matters in a putative class action. *See Glover v. Wells Fargo Home Mortg.*, 629 F. App'x 331 (3d Cir. 2015), *cert. denied*, 578 U.S. 1012 (2016). The Third Circuit did not address any constitutional objections to this arrangement. But the court noted that the parties apparently consented to the use of a special master (at least initially); the district court had reviewed and approved the magistrate's appointment of the special master; and the district court had reviewed and entered the final order. *See id.* at 336–37, 340. Under the circumstances, it is plausible that this arrangement comported with Article III either because of the parties' consent or because the district court exercised requisite control. Similar cases involving a magistrate judge's appointment of a special master do not state whether the parties consented and do not consider any potential constitutional infirmities. *See, e.g.*, *United States v. Griffin*, 440 F.3d 1138, 1140 (9th Cir. 2006); *Schmucker v. Johnson Controls, Inc.*, No. 3:14-CV-01593, 2019 WL 718553, at *3 (N.D. Ind. Feb. 19, 2019). In 2024, a magistrate judge denied a motion to appoint a special master, finding "it uniformly appears that in the [Central District of California], District Judges, not Magistrate Judges hear motions seeking the appointment of special masters." *SEC v. Drexler*, No. 2:23-CV-05102, 2024 WL 4002855, at *1 (C.D. Cal. May 23, 2024).

[5] We do not here identify any specific Article III defect in the use of special masters for tasks involving purely core bankruptcy claims, but we recognize that such tasks may be difficult (if not impossible) to cleanly separate in cases involving both core and non-core claims.

ing the consent of the parties,[6] the proposed amendments do not appear to adequately ensure that the special master is "appointed, and subject to removal, by the district court" or that "the ultimate decisionmaking authority" remains subject to that court's *de novo* review. *Northern Pipeline*, 458 U.S. at 79 (plurality opinion).

Although the draft proposals are somewhat vague, they appear to contemplate the bankruptcy judge's unilateral appointment and subdelegation of functions to the special master. For example, the ABA Proposal suggests that "courts"—presumably meaning bankruptcy courts—"may order the appointment of neutrals in the same manner and subject to the same limitations and requirements as are set forth in [Federal Rule of Civil Procedure] 53(a) through (g)(1)." Advisory Committee Memo at 2. None of the proposals expressly conditions the appointment of a special master on the approval of the district court. Nor do the proposals appear to contemplate a role for the district court in approving what tasks may be subdelegated to the special master.

Furthermore, if an Article III judge objected to the appointment or subdelegation of authority to a special master, there is no mechanism—either in the current rules or in the proposed rules—that would permit the Article III judge to withdraw those functions from the special master and return them to the bankruptcy judge. To be sure, a district court judge could withdraw the reference of a matter to a bankruptcy judge in part or in its entirety. *See* 28 U.S.C. § 157(d). But that extreme remedy would impose substantial burdens on the Article III court, thwarting the court's decision to delegate to a bankruptcy judge rather than to a master in the first place. Thus, the proposed amendments would likely empower bankruptcy judges to supplant the district court's supervision and to insulate subdelegated proceedings from effective Article III control. *Cf. Wellness International*, 575 U.S. at 678 (explaining that the relevant "question must be decided not by formalistic and unbending rules, but with an eye to the

---

[6] We note that "during the early years of the Republic, federal courts, with the consent of the litigants, regularly referred adjudication of entire disputes to non-Article III referees, masters, or arbitrators, for entry of final judgment in accordance with the referee's report." *Wellness International*, 575 U.S. at 674 (alteration accepted). But it is unclear how consent would operate in non-adversarial bankruptcy proceedings, considering that contested matters do not necessarily have identified or identifiable parties.

practical effect that the practice will have on the constitutionally assigned role of the federal judiciary" (internal quotation marks omitted)).

The draft proposals are also unclear about the tasks that special masters would perform. The Kaplan Proposal incorporates Federal Rule of Civil Procedure 53 and the scope of duties therein provided. *See* Advisory Committee Memo at 2.[7] The Subcommittee Proposal slightly modifies Rule 53 by omitting considerations of consent and proposing that special masters may "hold hearings and make or recommend findings of fact on issues to be decided without a jury" if their appointment is warranted by "(i) some exceptional condition"; or "(ii) the need to perform an accounting, estimate claims, or resolve a difficult computation of damages, including an award of attorney's fees." Advisory Committee Memo at 3 (footnotes omitted). It also proposes that special masters may "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available bankruptcy judge of the district." *Id.* at 4.

These proposals do not adequately ensure an Article III court's control over non-core claims. The proposals fail to ensure that the special master's "proposed findings and recommendations" in connection with non-core claims would be "subject to *de novo* review" by an Article III court. *See Northern Pipeline*, 458 U.S. at 79 (plurality opinion). And the proposals appear to contemplate subdelegation of non-ministerial tasks involving "the exercise of judgment or discretion" without an Article III

---

[7] Rule 53 provides that a master may:

(A) perform duties consented to by the parties;

(B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:

   (i)   some exceptional condition; or

   (ii)  the need to perform an accounting or resolve a difficult computation of damages; or

(C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. P. 53(a)(1). The notes to Rule 53 warn that "[d]irect judicial performance of judicial functions may be particularly important in cases that involve important public issues or many parties. At the extreme, a broad delegation of pretrial responsibility as well as a delegation of trial responsibilities can run afoul of Article III." Fed. R. Civ. P. 53 note (2003).

judge's authorization. *See Disposition of Shipping Board Vessels*, 33 Op. Att'y Gen. at 580. After all, fact-finding is likely a judicial, not a ministerial, function. *See supra* Part II. Even quantitative bankruptcy tasks such as performing an accounting or calculating an award of attorneys' fees may require "judicial functions," such as "additional factual development and the exercise of judicial discretion." *In re Yazoo Pipeline Co., L.P.*, 746 F.3d 211, 216 n.6 (5th Cir. 2014). When a bankruptcy court unilaterally subdelegates such functions, the district court loses "total control." The proposals therefore appear to involve subdelegations of judicial power derived from an Article III court without that court's permission or control.

In short, the proposed amendments in their current form appear to allow bankruptcy judges to unilaterally appoint a special master through procedures in which the district court has no direct say over the master's appointment, withdrawal, or scope of authority. These proposals therefore fail to "constantly subject to the court's control" whatever proceedings involving non-core claims occur before a special master. *See Raddatz*, 447 U.S. at 682.

### IV.

The Supreme Court has upheld delegated Article III functions only when an Article III court exercises total control. That control exists for bankruptcy judges under the strictures of 28 U.S.C. § 157, for magistrate judges under Federal Rule of Civil Procedure 73, and for special masters under Federal Rule of Civil Procedure 53. A bankruptcy judge's unilateral appointment of a special master to exercise functions related to non-core claims would deprive Article III courts of total control. Such subdelegations would violate Article III.

JOSHUA J. CRADDOCK
*Deputy Assistant Attorney General*
*Office of Legal Counsel*